John HARLEY et al.

v.

Richard E. LYNG et al.

Civ. A. No. 84–4101.

United States District Court, E.D. Pennsylvania.

Oct. 9, 1986.

On Remedial Order Dec. 22, 1986.

David Super, Niles Schore, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Susan Dein Bricklin, Asst. U.S. Atty., Philadelphia, Pa., for Richard E. Lyng.

David M. Donaldson, Philadelphia, for Pa. Dept. of Public Welfare.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

This case concerns the availability of declaratory and injunctive relief to enforce 7 U.S.C. § 2020(e)(9). The statute entitles desperately poor households to expedited issuance of benefits under the Food Stamp Act, 7 U.S.C. §§ 2011 to 29 (as amended). The certified class of plaintiffs comprises Pennsylvania applicants eligible for such expedited issuance. Defendants include officials heading Pennsylvania's Department of Public Welfare (DPW) and the United States Department of Agriculture, Food and Nutrition Service (FNS).

DPW's responsibility to comply with all statutory and regulatory requirements under 7 U.S.C. § 2020(e), *see Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 2526–27, 86 L.Ed.2d 81 (1985), provides the basis for the Amended Complaint. Plaintiffs generally allege that the agency has violated the

statute by failing to allow and to encourage all prospective applicants to apply for benefits when they first enter a food stamp office and by failing to effectuate plaintiffs' rights to expedited issuance. In particular, plaintiffs argue that a DPW regulation, Public Assistance Eligibility Manual (PAEM), § 505.4(f)(2), at 505–18a (Temporary page 2) (governing expedited issuance), facially violates federal law. DPW's program was to have been kept lawful by FNS. *See* 7 U.S.C. § 2020.

On the scheduled trial date, plaintiffs and FNS offered a Consent Decree to settle most of their disputes. The federal defendant thus agreed that DPW's program denied plaintiffs' rights: "FNS's investigations of local DPW offices, FNS meetings and conversations with DPW, and the depositions taken of DPW personnel in this litigation have disclosed substantial noncompliance with the requirements of providing expedited issuance of food stamps found at 7 U.S.C. § 2020(e)(9) and in implementing regulations." Consent Decree ¶ I. The federal agency has expressly requested this court to issue a remedial order and, under the Consent Decree, promises to monitor DPW's compliance—including unannounced office visits to DPW's County Assistance Offices (CAOs) which receive applications for benefits, calls to spot-check on information given out at CAOs, and thorough reporting on all DPW procedures used to implement the Food Stamp Act. These procedures being appropriate, I approved the Consent Decree.

Before trial, DPW did not concede liability to plaintiffs. Neither did the agency concede the invalidity of its regulation to implement expedited issuance, instead arguing that the regulation conformed to FNS rules. This latter issue became complicated when, on the eve of trial, FNS changed the regulations used to implement 7 U.S.C. § 2020(e)(9). *See* 7 C.F.R. § 273.-2(i)(3), *reprinted and discussed* in 51 Fed. Reg. 10764, 10771–74, 10784–85 (March 28, 1986). This new federal regulation makes DPW's regulation invalid, but does not require major changes, and plaintiffs now argue that both rules facially violate the statute.

To resolve their disputes, the parties submitted numerous papers, including evidence (such as that in filed depositions, interrogatories, and affidavits) and well-crafted briefs (including motions for partial summary judgment).

## I.

On the issue of DPW's actual violations, the first question is whether plaintiffs have standing to obtain further relief. DPW cites *Tyler v. Pasqua*, 748 F.2d 283, 285–87 (5th Cir.1984), for the proposition that there is no private right of action to pursue claims that a state improperly administers its food stamp program. The key finding in *Tyler* was that the Food Stamp Act established a "comprehensive enforcement mechanism," with fair hearing procedures and federal oversight, precluding that plaintiff's claim. *Id.* at 287 (citing 7 U.S.C. §§ 2020(e)(10), (g)). However, even if correct, that decision does not govern the present case. *Tyler* involved a *pro se* litigant seeking individual relief; *id.* at 284 & n. 2, whereas this case involves claims of systematic maladministration of a program. The existence of comprehensive remedies for an individual does not necessarily mean that similarly comprehensive remedies exist for a class. *Cf. Bowen v. City of New York*, —— U.S. ——, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986).

In two recent cases involving class actions challenging a state's systematic administration of the Food Stamp Act, the Supreme Court has addressed the merits of plaintiffs' claims without a hint of any problem of standing. *Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *Knebel v. Hein*, 429 U.S. 288, 97 S.Ct. 549, 50 L.Ed.2d 485 (1977). Even if the Food Stamp Act does not itself create a private right of action, plaintiffs have standing under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *id.* at 36, 100 S.Ct. at 2520–2521 (Powell, J., dissenting).

Defendants correctly observe that "[w]hen the remedial devices in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). In *Sea Clammers,* however, the Court considered a statute "including ... two citizen suit provisions," *id.,* reflecting congressional consideration of how much of a private remedy to give. My conclusion that no comparable enforcement scheme exists under this statute, *cf., e.g., Alexander v. Polk,* 750 F.2d 250, 259 (3d Cir.1984) (finding a private right of action to enforce rights under the Supplemental Food Program for Women, Infants, and Children), is buttressed by a House Committee report in 1977 that "administrative remedies against the state ... should not be construed as abrogating in any way private causes of action against states for failure to comply with Federal statutory or regulatory requirements." H.Rep. No. 464, 95th Cong., at 398, *reprinted in* 1977 *U.S.Code Cong. & Ad.News* 1704, 1971, 2327. Accordingly, I conclude that plaintiffs have the requisite standing.

■ DPW also incorrectly suggests that this court's remedial power is limited by FNS's agreement to begin intensive monitoring. The Consent Decree provides none of the injunctive relief requested by plaintiffs. In fact, FNS lacks power to enjoin improper state action, but can only notify the offending state and refer the matter to the Attorney General. *See* 7 U.S.C. § 2020(g). DPW has had ample notice that FNS considers the State agency's practices contrary to federal law and, given plaintiffs' standing, there is no reason to delay equitable relief by waiting for the Attorney General to sue. FNS is in accord with this conclusion.

As a final defense, DPW suggests that the evidence fails to prove that DPW affirmatively deprived plaintiffs of their rights. *See, e.g.,* DPW's Proposed Findings of Fact ¶¶ 24–30; DPW's Proposed

Conclusions of Law ¶¶ 39–40. On the contrary, I conclude that DPW has indeed failed to implement the federal law requiring expedited issuance of food stamps. The undisputed record provides over 400 examples of the State agency's dereliction of duty.

It would be unwieldy and pointless to detail each of these examples here. I will cite them, using the paragraph numbers in plaintiff's submission, to summarize DPW violations.

■ The Food Stamp Act and federal regulations impose a fundamental requirement that DPW allow and encourage all prospective applicants to apply for benefits on the same day that they first enter a food stamp office during business hours. *See* 7 C.F.R. § 273.2(c)(1, 2); *accord* Consent Decree ¶ II (a–e). However, certain CAOs set a maximum number of applications that will be accepted for processing in any day, turning others away: Elk (9); Forrest (10); Bedford (20); Westmoreland (12, 24, or 44, depending on the district office); Somerset (10, in the main office); Sullivan (4); Bradford (16); Snyder (4, and generally only by appointment); Tioga (8, except emergencies); Wyoming (9, except emergencies); Lebanon (22); Carbon (6, and only 15 for all benefits programs). ¶¶ 82, 85–86, 88–95, 98. Other CAOs set cut-off times after which they will not accept applications: Allegheny's CAO is among the worst of these, with the Eastern District office having posted a sign in the reception area explaining that, usually, no applications will be received after 9 a.m. and that agents will not guarantee to see prospective applicants who arrive after 8:30 a.m., ¶¶ 50–63; Schuylkill's CAO cuts applications off at 2 p.m., ¶ 76; and similar cut-off times (and related violations) were found in Philadelphia's CAO, ¶¶ 65–66, 77–78, 83–84, and Dauphin's CAO, ¶¶ 79–81. In the Wilkes-Barre District of Luzerne's CAO, prospective applicants are given application forms and told to take them home, fill them out, and mail them in, ¶¶ 67–70, as is often done in Lycoming's CAO, ¶¶ 71–72, instead of being advised that the form

should be completed immediately. Violations also were found in the following CAOs: Washington, Clearfield, Jefferson, Clinton, Centre, Franklin, and Cumberland. ¶¶ 64, 73–75, 87, 96–97. These violations not only deny applicants' general right to food stamps, they also impair plaintiffs' particular right to expedited issuance.

Plaintiffs have a right to expedited issuance. 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(a); *accord* Consent Decree ¶ II(f). However, DPW officials in some CAOs affirm that their offices virtually completely fail to effectuate this right. *See* ¶¶ 30–32 (Lehigh District of Philadelphia), ¶¶ 33–42 (several districts of Allegheny); ¶ 43 (Wilkes-Barre District of Luzerne); ¶¶ 44–46 (Lycoming); ¶ 47 (Jefferson); ¶ 48 (Schuylkill). Plaintiffs conclude, and DPW does not deny, that "[m]ore than one-third of the county and district offices whose staff was deposed openly admitted a general failure to provide expedited issuance." ¶ 49. These admissions are confirmed by statistics, which also show illegalities in DPW offices with less forthright agents; nationwide data collected for FNS reveals that between 30% and 50% of all applicants for food stamps deserve expedited issuance, ¶ 262; *see also* Stipulation Between Plaintiffs and Defendant Richard E. Lyng (April 7, 1986), whereas many Pennsylvania CAOs grant expedited issuance far less often, *see* ¶¶ 230–261 (between 0% and 2% of applicants received expedited issuance in 6 CAOs and in 11 district offices of 6 other CAOs; in one other district office between 3% and 8% of applicants received expedited issuance). No further analysis, statistical or otherwise, is needed to prove inexcusable noncompliance. *Cf. Hess v. Hughes,* 500 F.Supp. 1054, 1059–61 (D.Md.1980). But there is more.

DPW offices are obliged to review all food stamp applications, on the day of submission, to see if the household qualifies for expedited issuance, which must be provided without discouragement and not merely made available or "offered" to eligible people. *See* 7 C.F.R. § 273.2(a, i); *accord* Consent Decree ¶ II(l, n, s, v). However, certain CAOs simply refuse to read

over all applications when submitted, with some offices taking one to two weeks to screen the forms. *See* ¶¶ 101–138 (violations found in Allegheny, Philadelphia, Delaware, Northumberland, Chester, Washington, Luzerne, Lycoming, Jefferson, Schuylkill, Dauphin, and Wayne CAOs). Further, certain CAOs effectively deprive eligible applicants of expedited issuance by limiting screening to cover only general eligibility requirements unless the applicant takes initiative by specifically requesting expedited issuance or explaining the household's crisis state. *See* ¶¶ 139, 143–45, 147–48, 150–51, 153–56, 158, 370 (violations found in Allegheny, Northumberland, Chester, Washington, Carbon, Luzerne, Lycoming, Jefferson, and Schuylkill CAOs). In the Hill and Tioga Districts of Philadelphia's CAO, DPW agents only "offer" expedited issuance of food stamps to eligible applicants, with many of these offers being declined, ¶¶ 141–42, 159–60, apparently because DPW improperly penalizes recipients of expedited issuance by delaying cash assistance benefits, ¶¶ 162–64. Thus, DPW offices have shirked their duty to assess each applicant's entitlement to expedited issuance, and to provide this benefit when deserved.

Notwithstanding DPW's obligation to provide informed agents to process food stamp applications, *see* 7 C.F.R. §§ 272.-4(d), 273.2(i); *accord* Consent Decree ¶ II(m, q, r), even when they try to evaluate applicants' entitlement to expedited issuance some DPW offices apply incorrect standards. The statute and federal regulations make clear that, for the purposes of this program, benefits may not be denied for lack of verification of information in an application except for lacking verification of the applicant's identity, and not even for lacking verification of identity unless the agency attempts verification by collateral contact. 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(4)(i, ii); *see also* 7 C.F.R. § 273.-2(c, f, i) (protection for migrant workers). *Accord* Consent Decree ¶ II(h–k, o). However, before approving expedited issuance of food stamps, certain CAOs require veri-

fication of: whether an applicant has applied for child support, ¶¶ 166, 169, 173, 176, 184, has registered for work, ¶ 167, has actually separated from a spouse, ¶ 181, or has financial resources, ¶ 186; what is the applicant's citizenship, ¶¶ 170, 190, 193–94, income, ¶¶ 171, 175, 186–87, 197, residence, ¶¶ 172, 174–5, 177, 183, 187–88, 193–94, 196–97, or social security number, ¶¶ 177, 183, 188, 196; how a last job was lost by the applicant, ¶ 180, 185, 190, 193, and what is the value of the applicant's car, ¶ 183. (In at least one case, DPW's executive deputy secretary has approved such an erroneous requirement for verification. ¶¶ 303–305.) Further, some DPW offices require verification of all "questionable" information, ¶¶ 179, 186, and unclear factors of eligibility such as "past management", ¶ 192; others generally delay the process to verify some or all of the factors normally relevant to determine eligibility for food stamps, ¶¶ 168, 182–83, 189. Finally, some offices fail to make required collateral contacts where needed to verify identification. ¶¶ 178, 191, 195. Moreover, the statute and regulations define clear eligibility standards and limit the type of information that may be considered in evaluating applications. 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(f, i); *accord* Consent Decree ¶ II (f–h, j). However, certain CAOs apply the wrong income standards, ¶¶ 202–03, 208, 221, 224–26, use improper time standards, taking too long to act, ¶¶ 209, 353, 355–56, 363, 365, 358, 368–69, 371–72, 374–75, 379–80, 384, 387–89, 391–92, 396, 399–400, 407, or incorrectly define migrant status, ¶¶ 210–11. Others consider irrelevant factors such as: future access to cash assistance programs, ¶ 200; actual cash flow, ¶ 201; having food in a home, ¶¶ 204, 217; age or number of household members, ¶¶ 214, 216, 220, 222; relatives living nearby, ¶ 215; state of mortgage, rent, or utility bill delinquencies, ¶¶ 140, 217–18; views of community organizations, ¶ 218; or residency in a battered women's shelter, ¶ 223. Some DPW agents candidly admitted that they simply do not know or apply fixed standards for eligibility. ¶¶ 205–07, 212, 219; *see also* ¶¶ 350–51.

Obviously, many less forthright agents are equally ignorant.

■ "At a minimum, due process requires the [State] agency to explain, in terms comprehensible to the claimant, exactly what the agency proposed to do and why the agency is taking this action." *Ortiz v. Eichler*, 616 F.Supp. 1046, 1061 (D.Del.1985). Under 7 C.F.R. § 273.2(c)(4), each DPW office should post notices of applicants' rights, such as those to expedited issuance or appeal. *Accord* Consent Decree ¶ II(p). Further, under 7 C.F.R. § 273.15(d), DPW must advise applicants when they are denied expedited issuance and offer to hold an agency conference within two working days. *Accord* Consent Decree ¶ II(t). However, some offices post no notices, do not tell applicants when they are denied expedited processing, or do not offer to or hold agency conferences with applicants denied expedited issuance; in fact, in some offices important supervisory personnel do not know what an agency conference is. ¶¶ 264–297. In light of DPW's argument that the Food Stamp Act's procedures for timely review immunize the agency from private lawsuits, the failure to secure this protection is cruelly ironic.

■ Full access to expedited procedures may not be restricted based on inadequate staffing, scheduling problems, or unexpected seasonal influxes of applicants. *See* 7 C.F.R. §§ 273.2(a, c, e, f, i), 273.10; *accord* Consent Decree ¶ II(u). However, the evidence shows widespread computer problems that, when coupled with burdensome requirements to issue food stamps manually in local offices, impair plaintiffs' rights to expedited issuance. ¶¶ 307–12, 316–17, 320, 323–25, 328, 331, 337. Some DPW agents blame the processing delays on inadequate staff or on excessive paperwork requirements. *See* ¶¶ 313–15, 318–19, 321–22, 326–27, 329–30, 332, 334, 336, 338–40, 342. Finally, there is evidence that the centralized mailing of authorizations to purchase food stamps, from Harrisburg, can add four or more days to the time between application and receipt of food

stamps. ¶¶ 333, 335, 341, 343, 359–61, 366, 377, 381, 386, 395, 398, 402, 405, 408; *see also* ¶ 352 (centralized mailing creates special problems for the homeless). Although it is hard to say how much these administrative difficulties impair plaintiffs' rights, clearly they contribute to the overall problem.

### II.

When evaluating the federal regulations implementing 7 U.S.C. § 2020(e)(9), I acknowledge the general principle that FNS's interpretation of the legislation deserves some deference. However, as Judge Blumenfeld recognized in an earlier case challenging implementation of the Food Stamp Act in Connecticut, administrative actions may not distort "the clear and obvious language of the statutory mandate...." *Tyson v. Norton,* 390 F.Supp. 545, 552 (D.Conn.), *aff'd,* 523 F.2d 972 (2d Cir.1975). The same conclusion applies with even greater force to a State agency's regulation. In this case, neither the federal nor DPW's regulations comport with the governing statute.

■ Although a prior version was enacted in 1977, 7 U.S.C. § 2020(e)(9) was substantially revised by amendment in 1982. *Compare* Pub.L. 97–253, § 170, 96 Stat. 780 *with* Pub.L. 95–113, Title XIII, § 11(e)(9), 91 Stat. 972. The legislation now requires:

that the State agency shall—

(A) provide coupons no later than five days after the date of application to any household which—

(i)(I) has gross income that is less than $150 per month; or

(II) is a destitute migrant or a seasonal farmworker household in accordance with the regulations governing such households in effect July 1, 1982; and

(ii) has liquid resources that do not exceed $100; and

(B) to the extent practicable, verify the income and liquid resources of the household prior to issuance of coupons to the household.

For the reasons explained below, I conclude that this language entitles all eligible households to have food stamp coupons made available for use within five calendar days after properly submitting an application to DPW.

My analysis begins with consideration of three defined terms. "Coupons" are the food stamps themselves, used in place of cash to buy food in retail stores. 7 U.S.C. §§ 2012(d), 2013(a). An "allotment" is the total value of coupons authorized for a household to receive each month. 7 U.S.C. § 2012(a). "Authorization cards" are documents showing a household's allotment. 7 U.S.C. § 2012(b). As is permitted, to guard against theft during the coupons' distribution, DPW generally does not issue coupons directly to food stamp recipients but, instead, each month mails to all recipients a type of authorization card, called an Authorization to Purchase (ATP), that is taken to banks or other centers for conversion into coupons. *Pennsylvania Department of Public Welfare v. United States,* 781 F.2d 334, 335–36 (3d Cir.1986).

Within the larger scheme, this case deals only with the manner and timing of a State agency's initial provision of assistance to each deserving food stamp applicant. In general, "the State agency [must] ... complete certification of and provide an allotment ... to any eligible household not later than thirty days following its filing of an application." 7 U.S.C. § 2020(e)(3). For those households eligible for expedited issuance, however, thirty days without aid could mean hunger, malnutrition, or even starvation, as both houses of Congress recognized in legislative history declaring that households qualifying for expedited issuance need "immediate" help to buy food. S.Rep. No. 504, 97th Cong., at 52 (1982), *reprinted in* 1982 *U.S.Code Cong. & Ad. News* 1641, 1690; H.Conf.Rep. No. 759, 97th Cong., at 69 (1982), *reprinted in* 1982 *U.S.Code Cong. & Ad.News* 1846, 1864. To provide the needed help, Congress established the expedited issuance program requiring State agencies to "provide coupons no later than five days after the date

of application [by an eligible] household...." 7 U.S.C. § 2020(e)(9)(A).

FNS's new regulation suggests that a State agency can satisfy the expedited issuance requirement by mailing ATPs from a single centralized location "by the close of business on the fourth calendar day" after an eligible household filed its application and, if the fifth calendar day is a Sunday or Monday holiday, the State agency may postpone this mailing until Monday or Tuesday. 7 C.F.R. § 273.2(i)(3)(i), *reprinted in* 51 Fed.Reg. at 10784; *see also* 51 Fed.Reg. at 10772 (discussing this rule). DPW's regulation, PAEM § 505.4(f)(2)(i), similarly provides that "[f]or households entitled to expedited service, ... [DPW] shall mail the household's ATP no later than the close of business of the fifth calendar day following the day the application was filed."

■ Recognizing plaintiffs' evidence that DPW mailings often take four or more days to arrive, a delay that has been acknowledged as unfortunately typical for many mailings, *Grandison v. Moore,* 786 F.2d 146, 149 (3d Cir.1986), I find that FNS's new regulation can allow a two-week (or longer) delay between an initial application and receipt of benefits. For example, if an applicant comes in on Tuesday, the fifth calendar day is Sunday, so the ATPs are mailed Monday; if these arrive too late for conversion to coupons on Friday or Saturday, the household gets no assistance until the next Monday. Obviously, a two-week service period does not address the immediate need of a family with under $100 in liquid assets and less than $150 monthly gross income. This result is not what Congress intended.

I trace the violation to three ways that 7 C.F.R. § 273.2(i)(3)(i) facially contravenes 7 U.S.C. § 2020(e)(9), two of these errors also being found in DPW's regulation. First, compliance must be measured by provision of coupons, not ATPs. Second, the coupons can be deemed provided only when they are made available for pick-up, near the applicant's address or, possibly, placed in a distribution system, such as the mails,

with proper allowance for delivery time, but cannot be deemed provided on the date of mailing (unless same-day delivery is assured). Third, the five-day statutory period means that the coupons must be provided within five calendar days, with no extensions based on holidays or weekends. The basis for these conclusions—which apply only to the expedited issuance program and therefore do not require alteration of DPW's centralized distribution system for anything except the first coupons to be received by a household—follows.

Plain statutory language establishes the first requirement. Congress wrote that expedited issuance requires the provision of "coupons," 7 U.S.C. § 2020(e)(9), in contrast to the general food stamp rule requiring provision of an "allotment," 7 U.S.C. § 2020(e)(3). FNS has interpreted the term "allotment" to allow provision of either coupons or ATPs, 7 C.F.R. § 273.2(g)(2), which may or may not be proper, but in any event the term "coupons" cannot be interpreted to encompass ATPs. As described above, ATPs cannot be used to buy food but instead must be converted and, because ATP conversion centers are often not open, an individual receiving only ATPs may be delayed in using the benefits to food-shop. To avoid this delay, State agencies and FNS must respect Congress' clear mandate to provide coupons themselves within the five-day period. *See also* S.Rep. No. 504, *supra,* at 93, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* at 1731 ("the State agency must provide food stamps within 5 days").

The State agency's duty to "provide" coupons must be interpreted with awareness that Congress intended the Food Stamp Act to help feed poor people, 7 U.S.C. § 2011, and that the mandate for expedited issuance exists to help the poorest people "immediately," *see supra.* Obviously, these purposes cannot be served while a household's first set of coupons or ATPs remains in the mail. These mailing times are proven substantial in Pennsylvania, *see supra,* and similar situations no doubt exist elsewhere. Thus, to fulfill the

statutory purposes, FNS's regulations must make allowances for mailing times, if mailing is to be permitted at all. See, *e.g.*, 7 C.F.R. § 273.2(g)(2), where FNS recognizes this obligation by requiring mailing of an allotment two days in advance of the statutory deadline for the first provision of food stamps in non-expedited cases. Similarly, to regulate those State agencies wishing to distribute ATPs, FNS must protect against excess delay due to closed conversion centers. Whatever delivery systems FNS allows for State agencies to provide coupons, the coupons must be reasonably guaranteed to be available for use within the five-day time period. *Cf. Gilman v. Helms*, 606 F.Supp. 644, 653 (D.N.H.1985) (stressing the importance of continuing benefits without any hiatus).

Legislative history for the 1982 amendment supports this standard, rather than defendants' proposal based on the date that coupons are sent. I note, preliminarily, that the House of Representatives favored granting more people benefits sooner than the Senate was prepared to offer. *See* H.Conf.Rep. No. 759, *supra*, at 69, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* at 1864. However, as part of a compromise, the House agreed to use much of the Senate's proposed language for this amendment. *See id.* Thus, if the Senate intended to create a standard based on the coupons being available for use, the House also so intended.

The Senate embraced a proposal originally made by Senator Dole. S.Rep. No. 504, *supra*, at 52, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* at 1690. Senator Dole repeatedly affirmed that this bill gave State agencies "up to 5 days to provide assistance." *E.g.*, 128 Cong.Rec. S9916 (daily ed. August 5, 1982); *id.* at S8752 (daily ed. May 5, 1982). Assistance does not exist when coupons are mailed, but only when they are available for use. Further, the Senate's Report expressly discussed the expedited issuance program as guaranteeing receipt of benefits, and characterized the legislation as providing that "benefits must be served" within five days. S.Rep. No. 504, *supra*, at 52, *reprinted in*

1982 *U.S.Code Cong. & Ad.News* at 1691. When time is of the essence, as here, the concept of service always includes an allowance for delivery time, if the service is not completed in person. *See, e.g.*, Fed.R.Civ.P. 6(e) (allocating three days after mailing before process is deemed served); *see also* 20 C.F.R. § 410.678 (allowing five days for receipt of notice of results in Social Security Administration hearings).

Thus, legislative declarations buttress the common-sense conclusion that provision of food stamps is complete only when the coupons are available for use by a deserving household. Further support for this proposition comes from an understanding of the reason why Congress amended the statute.

The Senate was concerned with fraud and errors occurring because State agencies lacked enough time to process applications for expedited service. S.Rep. No. 504, *supra*, at 52–54, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* at 1691–93. To prevent such problems, eligibility standards were clarified and tightened, and processing time was increased from three working days to five calendar days. (FNS does not dispute that the five-day period specified in 7 U.S.C. § 2020(e)(9)(A) refers to five calendar days. *See, e.g.*, 51 Fed. Reg. at 10772; 47 Fed.Reg. 53829 (Nov. 30, 1982).) To the extent that delay in getting benefits to recipients would not enable further review within the State agency—and obviously no protection against an applicant's fraud or administrative errors can be obtained once the coupons are mailed—Congress had no reason to allow extra delay. Having completed its processing by the fourth or fifth day after receiving an application, a central State agency office could easily transmit approval for expedited issuance by computer or, if necessary, call over a list of names, and local agency offices would then be able to hand-deliver a household's first food stamps by the fifth day after application without compromising program accuracy.

Indeed, such an approach is contemplated by two FNS regulations requiring that if mailing does not, in fact, meet the standards for expedited issuance, FNS will require local distribution of the first-provided coupons. 7 C.F.R. § 274.2(g)(1); *see* 7 C.F.R. § 274.3(b)(8). These regulations were known by Congress when it drafted the current 7 U.S.C. § 2020(e)(9). The statutory five-day rule, interpreted to require a distribution system reasonably guaranteeing to make coupons available for use within five calendar days, provides clear guidance to decide if such local distribution is necessary.

In addition to disputing plaintiffs' characterization of legislative history, defendants make the following counter-arguments. First, Congress knew in 1982 that some states used centralized mailing of ATPs to provide expedited issuance and said nothing to preclude this practice. However, then-effective regulations required mailing within two days after application. 7 C.F.R. § 273.2(i)(3)(i) (1982). Second, in 1982, Congress replaced statutory language that had established "households[' right to] receive coupons...." However, no legislative history suggests any significance to the change in words from receive to provide. Third, defendants argue that a bright line is necessary, and that the only bright line is the date of mailing. However, mailing need not be allowed if it is unreliable, and a bright line exists if coupons are distributed by a fixed date at local DPW offices. All told, I find defendants' arguments unpersuasive.

The remaining dispute concerns what to do about applications filed five days before a Saturday, Sunday, or holiday. On these days, some State agencies close their offices. Defendants assert that, without an extended number of days for processing applications with coupons due on weekends or holidays, state agencies will be unable to keep up and will be victimized by fraud and error.

FNS's new regulation belies this contention. In a typical period without holidays, processing of applications filed on Monday would have to be completed in four calendar days, and processing of applications filed on Wednesday through Friday would have to be completed in five calendar days. Six calendar days for processing would be allowed only for applications filed Tuesday. Clearly, with only a small extra effort, all processing could be completed within the five calendar day period. Asking for such an extra effort before a weekend is just, and fulfills the legislative purpose, because hunger takes no holidays. *See Gilman*, 606 F.Supp. at 648–49.

In any event, Congress simply did not generally delegate FNS authority to extend statutory deadlines in the Food Stamp Act merely for the convenience of State agencies. *See Hess v. Hughes*, 500 F.Supp. at 1059–60. When it so desired, Congress specifically granted limited authority to modify time standards set by the legislation. *See, e.g.*, 7 U.S.C. § 2020(e)(4) (allowing a change of timeliness standards for submitting a notice of expiration and filing an application for recertification "if administratively necessary"). Similarly, in other statutes Congress has expressly stated that duties due to be performed on a weekend or holiday may be postponed until the following business day. *E.g.*, 2 U.S.C. § 394(a); 17 U.S.C. § 703; 26 U.S.C. § 7503; 50 App.U.S.C. § 32(b). That was not done in 7 U.S.C. § 2020(e)(9), and defendants cite no other program where an agency unilaterally may extend a time period specified by statute. In the context of a duty to provide emergency aid, such a power to extend the time for compliance is least likely to be implied. It will not be done here.

■ In addition to identifying the regulations' substantive infirmities, plaintiffs argue that FNS violated 7 U.S.C. § 2013(c) when revising 7 C.F.R. § 273.2(i)(3). The statute requires that all regulations shall be promulgated "in accordance with the procedures set forth in" the Administrative Procedure Act, 5 U.S.C. § 553. This, plaintiffs say, requires a full notice and comment rule-making, which was not done. Defendants respond that such procedures

are not necessary because the new regulation is merely interpretive under 5 U.S.C. § 553(b)(A) and that the procedures would, in any event, be impracticable under 5 U.S.C. § 553(b)(B). This response is undermined by the regulation's force of law, the merits of plaintiffs' substantive argument, and the long time, about four years, that FNS took to finalize the regulation. *See Aiken v. Obledo*, 442 F.Supp. 628, 649–50 (E.D.Cal.1977). However, I need not and do not answer the precise question of what procedures are required to promulgate rules implementing 7 U.S.C. § 2020(e)(9).

## CONCLUSION

For the reasons set forth, I conclude that DPW's practices do not conform to the Food Stamp Act and that neither 7 C.F.R. § 273.2(i)(3) nor PAEM § 505.4(f)(2) can be sustained under 7 U.S.C. § 2020(e)(9). The parties have requested thirty days to negotiate remedial action. This will be respected. An appropriate Order follows.

## ORDER

AND NOW, this 9th day of October, 1986, it is DECLARED:

1. That the Pennsylvania Department of Public Welfare (DPW) has violated the Food Stamp Act by failing to allow and encourage all prospective applicants to apply for benefits on the same day that they first enter a food stamp office during business hours and by failing to effectuate plaintiffs' rights to expedited issuance of food stamps;

2. That DPW's regulation purporting to allow compliance with 7 U.S.C. § 2020(e)(9) by centralized mailing of Authorizations to Purchase food stamps five calendar days after the filing of an application for benefits, is INVALID; and

3. That 7 C.F.R. § 273.2(i)(3), as revised March 28, 1986, is INVALID.

IT IS FURTHER ORDERED:

4. That defendants' motions for partial summary judgment are DENIED;

5. That plaintiffs' motions for partial summary judgment are GRANTED;

6. That DPW, its employees, and their agents are ENJOINED to assure that, for households eligible for expedited issuance, food stamp coupons are made available for use by the households within five (5) calendar days after the households file their applications; and

7. That the parties shall submit a proposed remedial Order or Orders within thirty (30) days.

## MEMORANDUM AND ORDER

### ON REMEDIAL ORDER

In this class action to determine the rights of Pennsylvania's poorest residents to expedited issuance of food stamps, I resolved the liability issues on October 9, 1986. Agreeing with findings by the United States Department of Agriculture, Food and Nutrition Service (FNS), I concluded that Pennsylvania's Department of Public Welfare (DPW) systematically ignored the mandates of 7 U.S.C. § 2020(e)(9) and the statute's implementing regulations. Further, I concluded that the existing federal regulations did not assure all the benefits intended by Congress. Accordingly, I granted declaratory relief and, pursuant to the parties' joint request, allowed 30 days for the submission of proposed remedial orders.

The time for these submissions was extended in response to several requests by plaintiffs, who ultimately submitted their revised proposed order on December 1, 1986. Plaintiffs' proposal—totaling some 45 pages, including forms, posters, and regulations proposed for use by DPW—is too long, too detailed, and too likely to expand this litigation into unnecessary areas. DPW's counter-proposal, no closer to the mark, omits important provisions. A third set of submissions, tendered jointly by plaintiffs and FNS, concerns proposed revisions to the relevant federal regulations. The various papers raise several issues worthy of discussion.

## I.

As against DPW, the relief will be tailored to effect two main requirements of the prior decision. First, DPW must assure that, for each household eligible for expedited issuance of food stamps, the coupons are made available for use within five calendar days after the household's representative files an application. Second, DPW must assure that representatives of eligible households are encouraged to apply for their statutory entitlements. On both counts, DPW's track record is unsatisfactory. In the court-approved Consent Judgment resolving disputes between plaintiffs and FNS, federal officials acknowledged their duty to supervise the rehabilitation of DPW's food stamp delivery system, including a monitoring program. So long as this program is carried out, the executive branch will be accorded primary responsibility for enforcing the law. Notwithstanding this, certain of plaintiffs' proposed remedial orders are so obviously necessary that, to avoid delay righting existing wrongs, immediate relief will be granted.

Plaintiffs' and DPW's proposed orders include declarations of the meaning of federal regulations that FNS follows when implementing the Food Stamp Act, 7 U.S.C. § 2011 et seq. Similar declarations were made in the Consent Judgment, ¶ II(a–v), to resolve some of plaintiffs' claims against FNS; those declarations correctly state the federal law that governs DPW's program. To the list in the Consent Judgment, citing 7 C.F.R. § 273.2(c)(1), plaintiffs would add a declaration that food stamp offices

> may not refuse to accept and immediately begin processing applications that contain at least the applicant's name, address, and signature and may not require or suggest that a person handing in such an application take it back and have it completed outside of the local office or with the help of strangers or agencies not present in the local office.

This also is correct, and will be included in the list of declarations. DPW resists some of these declarations, on the ground that its institutional flexibility is threatened.

This argument fails because DPW is bound to follow federal regulations; these regulations exist to eliminate DPW's institutional "flexibility" that caused the massive violations of law previously documented. There being no objections filed by FNS, the remedial order will incorporate appropriately adapted versions of the declarations of law previously agreed to by FNS, as supplemented by plaintiffs' above-noted request.

Plaintiffs and DPW agree that the remedial order must provide some notice of the rights enforced in this case. Due process principles compel recognition that, although some citizens may learn of this decision through the media, such traditional sources are unlikely to reach the members of plaintiffs' class. One piece of the solution to this problem, plaintiffs and DPW agree, is for DPW to print certain flyers for display and distribution in food stamp offices. Plaintiffs further request, but DPW opposes, an order that DPW supply these flyers for display and distribution by community groups serving low-income people and by unemployment offices. This makes sense, but only for a limited period of time: any misinformation that DPW spread by its past actions must be corrected, but the passage of time should eliminate much of that problem; and recognizing that some time will be required to educate DPW employees, potential food stamp applicants deserve the extra benefits that accompany a court-approved, comprehensible, statement of their entitlements. Therefore, the remedial order will include a pre-application notice provision.

Plaintiffs and DPW agree that, after prescreening applications for food stamps, DPW must provide applicants written notice confirming or denying the household's eligibility for expedited issuance. Plaintiffs proposed order, ¶ III.B, specifies procedures and formats for DPW to employ in this process. I consider this degree of specificity unnecessary, on the present record.

Plaintiffs and DPW agree that each food stamp office must display a poster describing food stamp rights enforced by this

court and must display a copy of this court's Order. The plaintiffs' proposed order is unnecessarily detailed and would require posting of this court's Order for an unduly long time. DPW's proposal will, in essence, be adopted.

Plaintiffs and DPW take contrary positions concerning the revision of DPW's regulations governing expedited issuance of food stamps. Plaintiffs have submitted a 22–page proposed regulation that they would like this court to impose upon DPW. In response, DPW argues that it deserves a first chance to rewrite its regulation. The parties also disagree about procedures to govern DPW's future amendments of the relevant regulations. Obviously, these regulations now must be revised substantially and, because of DPW's institutional record of promising without delivering meaningful changes in its operation of the expedited issuance program for food stamps—litigation on this issue began at least twice in the decade preceding this action—plaintiffs make a strong argument for imposition of the proposed regulations. However, as part of its general duty to comply with the decision in this case, DPW will be given one more chance to revise, implement, and, subject to existing due process requirements only, amend the appropriate regulations. If the revised regulations do not fully instruct DPW employees in their duties, then specific changes will be ordered.

Plaintiffs and DPW disagree about the need for various monitoring procedures to ensure that DPW's food stamp program provides plaintiffs' entitlements. For now, I reject plaintiffs' proposed order insofar as it would authorize plaintiffs' counsel to employ "testers" to submit applications for benefits that the testers do not in fact deserve, or would require DPW to provide applicant-controlled date stamps, weekly reporting of information derived from expedited issuance control cards (chronicling significant events following an application for food stamps), reports on local office operating procedures, or in-house evaluation by DPW management of local food stamp office practices. These proposed monitoring procedures all make sense to a greater or lesser degree, but, given FNS's primary responsibility to oversee the Commonwealth's food stamp program, such procedures ought be designed and controlled by FNS unless plaintiffs demonstrate that FNS's monitoring is ineffective.

Plaintiffs and DPW agree that they must cooperate in the future to resolve problems as these may appear, but the parties disagree about how to set standards of appropriate performance. Plaintiffs suggest a benchmark that, by one year from now and thereafter, 47% of all food stamp applications should be processed on an expedited basis. No factual predicate for this standard exists, and, especially during the first year of FNS's monitoring, it makes little sense to establish plaintiffs' proposed reporting and re-education scheme based on the fraction of food stamp awards granted on an expedited basis. However, as demonstrated in the Memorandum and Order of October 9, 1986, at p.7, important insights may be gained from the study of statistics concerning the numbers of food stamp applicants receiving expedited issuance, and these statistics should promote useful dialogue during meetings of plaintiffs and DPW, so the remedial order will provide that such data must be gathered and shared with plaintiffs on a monthly basis.

Plaintiffs and DPW agree that DPW must cooperate with FNS's monitoring program under the Consent Judgment. Their only disagreement concerns the need for DPW to waive a provision of the Consent Judgment that entitles DPW offices to two hours notice of an FNS monitoring visit. Plaintiffs have not shown the need for such a waiver, so it will not be ordered.

Plaintiffs and DPW disagree about format considerations in the design of food stamp applications. Plaintiffs ask that all applications have a tear-off form by which applicants can note their desire and eligibility for expedited issuance. DPW responds that it deserves an opportunity to design an appropriate application from. Plaintiffs also ask that, in communities where many

people are literate only in languages other than English, important forms and notices be published in languages understood by the local residents. DPW responds that it is discussing this issue with FNS. For now, I decline to issue a dispositive order, but, as part of its general duty to comply with the decision in this case, DPW will be ordered to report on its resolution of these issues.

Plaintiffs' remaining request for relief, not discussed by DPW, concerns the appropriate training and evaluation of DPW employees who may be involved in processing food stamp applications. Obviously, such training is needed in Pennsylvania and, since it as is required by federal food stamp regulations, will be ordered. However, the details of the training need not be prescribed here. Similarly, while surely DPW regularly will remind its employees of their duties regarding expedited issuance and will review the performance of individual employees as part of its compliance with FNS's monitoring, no special order on this point should be needed for remedial purposes.

## II.

As against FNS, plaintiffs' remaining concern is that the agency rapidly publish revised regulations governing expedited issuance of food stamps. FNS has prepared and submitted a proposed interim rule. In short, it provides for a revision so that 7 C.F.R. 273.2(i)(3)(i) would state:

For households entitled to expedited service, the State agency shall make available to the recipient coupons or an ATP card not later than the fifth calendar day following the date an application was filed. Whatever system a State agency uses to ensure meeting this delivery standard shall be designed to allow a reasonable opportunity for redemption of ATPs no later than the fifth calendar day following the day the application was filed.

Without attempting to determine if this proposed rule suffices for all statutory purposes, I do not find that the rule facially contravenes the October 9, 1986 decision. I will order that FNS proceed to comply with its duty to revise the relevant regulations in accordance with proper administrative practice.

The remedial Order follows.

## ORDER

AND NOW, this 22nd day of December, 1986, it is ORDERED:

1. That DPW shall assure, for each household eligible for expedited issuance of food stamps, that coupons are made available to that household for use within five (5) calendar days after a household's representative files an application, that this requirement cannot be satisfied by mailing coupons to households (given the acknowledged risk of theft), and that this requirement may be satisfied by mailing Authorizations to Purchase coupons (ATPs) only if the ATPs are sent by a carrier that guarantees delivery before noon on a non-weekend, non-holiday day within five (5) days after the day the relevant application was filed (given the proven unreliability of Pennsylvania's regular mail system).

2. That DPW shall assure that:

a. persons coming into food stamp offices during business hours and expressing an interest in receiving food stamps are allowed and encouraged to apply for food stamps that day. (7 C.F.R. § 273.2(c)(1) & (2).)

b. food stamp offices document the date an application is filed by recording on the application (such as by date-stamping) the date it is received. (7 C.F.R. 273.2(c)(1).)

c. food stamp offices do not refuse food stamp applications submitted to them at any time during business hours. (7 C.F.R. 273.2(c)(1) & (2).)

d. food stamp offices do not limit the number of applications they will accept during a day with any quota or schedule. (7 C.F.R. 273.2(c)(1) & (2).)

e. food stamp offices do not suggest or require that prospective applicants wishing to hand in applications should

mail them in instead. (7 C.F.R. 273.-2(c)(1) & (2).)

f. Food stamp offices neither deny persons their right to apply nor deny them their right to be screened for expedited issuance of food stamps. (7 C.F.R. 273.2(a); (b); 273.2(i)(2).)

g. food stamp offices do not count anticipated income from public assistance benefits in determining eligibility for expedited issuance of food stamps or the amounts of expedited allotments unless the State agency is reasonably certain the income will be received during the remainder of the certification period. If the amount of income that will be received or when it will be received is uncertain, that portion of the household's income that is uncertain shall not be counted. (See FNS letter to DPW dated December 18, 1985, on file in this court).

h. food stamp offices do not delay the holding of an appointment or the authorization of food stamps because of an applicant's failure to verify or cooperate with the establishment of eligibility factors that apply to other public benefit programs but do not apply to food stamps, even if this requires holding separate interviews for authorizing expedited issuance of food stamps and other benefits. (7 C.F.R. 273.2(c), (f) & (i).)

i. food stamp offices do not require migrant or seasonal farm workers to verify their status as migrant or seasonal farm workers to receive expedited service, however, the food stamp offices may seek to verify the applicant's status so long as the completion of expedited service is not delayed beyond the five (5) days. (7 C.F.R. 273.2(i).)

j. food stamp offices do not condition migrant or seasonal farm workers' right to apply or to receive expedited issuance upon their applying with other crew members, their applying with the help of or verification from their crew leader, or their applying with the help of or verification from an employer or potential employer. (7 C.F.R. 273.2(c)(1) & (2).)

k. food stamp offices do not require migrant or seasonal farm workers to pro-duce verification from out-of-state sources to receive expedited issuance of food stamps. (7 C.F.R. 273.2(i)(4).)

l. food stamp offices pre-screen all food stamp applicants for eligibility for expedited issuance the same day they apply, and State agencies must clearly require this in the expedited issuance section of their manuals, regulations, or procedures. (7 C.F.R. 273.2(i)(2).)

m. food stamp office receptionists, income maintenance workers, first-level supervisors, and higher-level supervisors are aware of the requirements and procedures for expedited issuance of food stamps. (7 C.F.R. 272.4(d).)

n. food stamp office provide expedited issuance; it is not sufficient that expedited issuance be "offered" to eligible persons. (7 C.F.R. 273.2(a) & (i).)

o. food stamp offices do not deny expedited issuance to eligible persons for failure to verify identity without attempting to verify the applicant's identity with a collateral contact. (7 C.F.R. 273.-2(i)(4)(i) & (ii).)

p. food stamp offices have posters readily visible in reception areas explaining the right to apply on the day of the applicant's first contact with an office and the right to, and processing standards for, expedited issuance. (7 C.F.R. 273.2(i)(4).)

q. food stamp office receptionists are trained to give correct information consistent with all relevant federal regulations about application procedures to people approaching offices, and personnel answering telephones in offices are trained to give the same correct information about application procedures to people calling those offices. (7 C.F.R. 272.-4(d); 273.2(i).)

r. food stamp offices provide expedited issuance to all eligible applicants whether their applications are being processed by a special intake department or by other staff, such as ongoing eligibility workers. (7 C.F.R. 273.2(a), (c) & (i).)

s. food stamp offices do not evade the expedited issuance time frames by

presenting or discouraging prospective applicants from applying. (7 C.F.R. 273.-2(a), (c) & (i).)

t. food stamp applicants are advised when they are denied expedited issuance, to allow applicants to decide whether they wish to request an informal agency conference, an administrative fair hearing, or both, and food stamp offices offer to hold informal agency conferences within two (2) working days with supervisory staff and applicants where applicants wish to contest the denial of expedited issuance. (7 C.F.R. 273.15(d).)

u. inadequate staffing, scheduling problems, and unexpected or seasonal influxes of applicants in general, or of applicants eligible for expedited issuance specifically, do not deny people the right to apply the same day they contact a DPW office to be screened on the day of their applications to determine their entitlement to expedited service, or to be provided expedited issuance within the five-day period, since all continued eligibility workers should be trained and competent in expedited service and able to process applications if necessary. (7 C.F.R. 272.4(d); 273.2(a), (c), (e), (f) & (i); 273.10.)

v. food stamp offices do not explain or suggest disadvantages of expedited issuance, to DPW or to applicants, when communicating with applicants or prospective applicants, and do not otherwise discourage applicants from receiving expedited issuance. (7 C.F.R. 273.2(a), (c) & (i).)

w. food stamp offices do not refuse to accept and immediately begin processing applications that contain at least the applicant's name, address, and signature, and do not require or suggest that a person handing in such an application take it back and have it completed outside of the local office or with the help of strangers or agencies not present in the local office. (7 C.F.R. 273.2(c)(1).).

3. That DPW shall provide pre-application notice of rights to expedited issuance of food stamps, as follows:

a. for so long as the program operates, DPW shall print a sufficient quantity of notices, using a format agreed to by the parties, to maintain an unexhausted supply of these notices for display and distribution in all food stamp office reception areas and display racks; and

b. for thirty-six (36) months, DPW shall print twenty thousand (20,000) notices per month, using a format to be agreed to by the parties, to be given to plaintiffs' attorneys for delivery to and distribution by consenting organizations chosen by plaintiffs' attorney.

4. That in the reception area of all food stamp offices, for so long as the program operates, DPW prominently shall display a large, sturdy poster, using a format agreed to by the parties, that informs food stamp applicants of their rights to expedited issuance and that identifies a nearby office providing free legal assistance to poor people.

5. That in the reception area of all food stamp offices, for twelve (12) months, DPW shall display a copy of this Order.

6. That, to enable meaningful assessment of the food stamp program's operation, DPW shall gather and maintain appropriate data, including all data that is requested by FNS and, in any event, monthly data concerning the numbers of food stamp applications received and the numbers of food stamp awards issued on an expedited basis.

7. That, as part of its general duty to comply with the decision in this case, by February 1, 1987, DPW shall file with this court a detailed description of its plan to establish a program that guarantees expedited issuance of food stamps to deserving applicants, such report should include a proposed timetable for completion of major steps, with particular attention devoted to the promulgation of appropriate new regulations, the distribution of revised manuals, the publication of proper forms, the implementation of needed standard operating procedures (including those to deal with foreign language speaking potential appli-

cants and homeless applicants), and the training of personnel.

8. That DPW shall cooperate by meeting with plaintiffs when necessary to discuss perceived problems in the food stamp program, shall cooperate with FNS by complying with all requests that facilitate monitoring, and shall refrain from punishing any DPW employee based on the employee's good faith effort to assist FNS or plaintiffs' monitoring of DPW's program.

IT IS FURTHER ORDERED that FNS shall publish an interim rule to comply with the decision in this case within five (5) days, and that a final rule shall be established in conformance with appropriate administrative practice.

The court retains jurisdiction.