## SOUTHSIDE WELFARE RIGHTS ORGANIZATION, et al., Plaintiffs,

v.

## Gary STANGLER, et al., Defendants.

### No. 90–4271–CV–C–66BA.

United States District Court,
W.D. Missouri,
Central Division.

Nov. 3, 1993.

Joel Ferber, Legal Services of Eastern Missouri, Inc., St. Louis, MO, for plaintiffs.

Paul T. Keller, Angela S. Marmion, Dept. of Social Services, Division of Legal Services, and Mary J. Browning, Missouri Dept. of Social Services, Jefferson City, MO, for defendants.

### *ORDER*

KNOX, United States Magistrate Judge.

On August 25, 1993, plaintiffs filed their motion for attorney fees and costs in the above-styled class action suit. Defendants have responded in opposition to part of plaintiffs' motion and plaintiffs have replied.

The court notes plaintiffs prevailed on certain issues in this case and a preliminary injunction has been issued. The injunction will be made permanent with this order.

■ "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable

hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). To determine what are "reasonably expended hours" and what is a "reasonable rate," twelve factors should be considered. *Johnson v. Georgia Highway Express*, 488 F.2d 714, 716–17 (5th Cir.1974); *Hardman v. Board of Educ.*, 714 F.2d 823, 825 (8th Cir. 1983). These are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The appropriate application of these factors differs from case to case and should be explained, because it is important "for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. at 438, 103 S.Ct. at 1942. An award of attorney fees is, thus, within the sound discretion of the district court. *Id.*

Plaintiffs seek an award, pursuant to 42 U.S.C. § 1988, of fees and costs totaling $633,616.58. Defendants assert this amount is excessive and includes some impermissible items or amounts. Defendants suggest an amount of $211,850.90.

After review of the parties' pleadings and application of the relevant factors, the court finds an amount of $334,570.15 to be appropriate.

### Application of the Factors

Clearly, this class action suit dealing with the processing of food stamp applications across the state took considerable time and labor. The case was originally filed in July, 1990, and continues through the present. Voluminous file studies were made of applications; regulations and procedures were reviewed; and statistics were compiled and analyzed in anticipation of the trial. The issues were briefed and boxes of documents were produced and prepared as exhibits. Nevertheless, the court finds certain of the hours billed and the rates charged by plaintiffs are excessive, and adjustments will be made accordingly.

■ Counsel for plaintiffs in this case are employed by Legal Services of Eastern Missouri, Inc. Legal Services provides legal assistance to low income persons without charge or with minimal charge, and serves the community by handling litigation affecting large numbers of low income and indigent persons as well as certain cases for individuals. Thus, while this case may have precluded counsel from handling some additional cases, this is the type of case counsel was hired to litigate and counsel was not prevented from taking more lucrative cases with greater income potential. Counsel should be reimbursed, however, based on a reasonable rate for comparable work in the private sector. *Oldham v. Ehrlich*, 617 F.2d 163 (8th Cir.1980).

■ Counsel billed hourly rates for Joel Ferber at $175, Molly Ryan at $130, Ann Lever at $175, and Dianne Taylor at $150. Defendants have not objected to the rates charged, but the court finds these rates to be excessive for this area of the country. Reasonable hourly rates for attorneys in similar cases and with comparable abilities, experience and reputations in Missouri range from $90 to $125. The affidavits from a few St. Louis attorneys suggesting higher rates are appropriate for plaintiffs' counsel are not persuasive. The affidavits setting forth rates and hours based on experience in the Washington, D.C., area must be adjusted downward for Missouri. Thus, reductions will be made in the hourly rates.

The parties have submitted no information indicating whether fee arrangements were made with plaintiffs, and the court has no reason to believe such arrangements were made.

Certain time limitations were imposed by the nature of the case insofar as plaintiffs are indigent individuals seeking expedited food stamps. Thus, plaintiffs pursued the case

with zeal and kept the case moving toward resolution. Although a case of this size might have been slow in the discovery phase, this case proceeded to trial on a schedule comparable to other cases filed in this court.

Similar claims have been brought in other states and the law is relatively clear on the issues. A careful analysis of the facts and statistics, however, was required by the parties, and the court will not say this was simple litigation. Certainly, voluminous documents were produced, analyzed, summarized and used at trial requiring a special knowledge of the food stamp system.

Likewise, complete understanding of the state procedures and federal law was required to present this case and defense, and counsel were required to present this information in a condensed, manageable form for the court.

Counsel for plaintiffs were extremely well prepared and contested in detail even minor issues. This court's oversight of the case suggests that excessive time was devoted to the case, on even the most insignificant of issues. Counsel were, perhaps, overly meticulous with regard to details, and appear to have spent an excessive amount of time preparing this case for trial in an effort to be complete. Counsel is commended for their thoroughness, but defendants should not be penalized for plaintiffs' over-exuberance on behalf of their clients.

After review of the itemizations presented by plaintiffs, the court finds the following to be reasonable rates for plaintiffs' counsel, based on the skill of the attorneys and the hours billed:

| Attorneys | Hours | Rate/Hour | Subtotal | Total |
|---|---|---|---|---|
| Joel D. Ferber | 2046.2 | $125 | $255,775.00 | |
| Molly A. Ryan | 1319.9 | 90 | 118,791.00 | |
| Ann B. Lever | 339.3 | 125 | 42,412.50 | |
| F. Dianne Taylor | 123.8 | 100 | 12,380.00 | |
| Total | 3829.2 | | | $429,358.50 |
| | | | (Less one-fourth | 107,339.62) |
| Attorney Total | | | | $322,018.88 |

This total was reduced by $107,339.62, or one-fourth, to reflect excessive or unnecessary efforts by counsel.

■ The court notes law clerks performed some clerical work (copying) in this case, and the court will adjust law clerk hours to exclude work which is implicitly included in attorney fees. Reductions will also be made in the hourly rate because fees charged for student law clerks in the Missouri area at $40.00 per hour are excessive and exceed their actual cost. Twenty Dollars per hour, which the court finds to be a reasonable rate, will be used to calculate these fees. The following are approved as reasonable hours and fees for student law clerks.

| Law Clerks | Hours | Rate/Hour | Subtotal | Total |
|---|---|---|---|---|
| G. Mark Thomas | 106 | | | |
| Julie A. Mersch | 29 | | | |
| Loretta Haggard | 35 | | | |
| Wendy Williams | 13.4 [1] | | | |
| Steve Doria | 17.8 | | | |
| Total | 201.2 | $20 | $4,024.00 | |
| Law Clerk Total | | | | $ 4,024.00 |
| Attorney Total | | | | 322,018.88 |
| Total Attorney Fees | | | | $326,042.88 |

1. Williams' hours include one 8–hour day when Williams testified. These hours should not be included as attorney fees. Plaintiffs may submit a request for a witness fee for Williams in their bill of costs.

■ Additionally, plaintiffs will be awarded expenses in the amount of $8,527.27. This amount is reduced, where appropriate, to reimburse expenses for no more than two attorneys and one law clerk at trial, depositions, or file reviews. The reduced amounts are broken down as follows:

| | | |
|---|---|---|
| Trial Hotel Expenses ($1,013.71 less $253.43) | $ 760.28 | |
| Individual Travel Expenses | 7,356.18 | |
| Express Mail | 410.81 | |
| Total Expenses | | $8,527.27 |

---

IT IS, THEREFORE, ORDERED that plaintiffs are awarded reasonable attorney fees in the amount of $326,042.88. It is further

ORDERED that plaintiffs are awarded expenses in the amount of $8,527.27. It is further

ORDERED that the preliminary injunction entered in this case on July 27, 1993, is hereby made permanent. It is further

ORDERED that within forty (40) days of the date hereof, the parties submit to the court their bill of costs, under Fed.R.Civ.P. 54(d), for review by the undersigned. It is further

ORDERED that within thirty (30) days of the date hereof, the parties contact the Clerk's Office and make arrangements to retrieve trial exhibits.

ATTACHMENT

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION

SOUTHSIDE WELFARE RIGHTS

ORGANIZATION, et al.,

Plaintiffs,

v.

GARY STANGLER, et al.,

Defendants.

No. 90–4271–CV–C–66BA

*PRELIMINARY INJUNCTION*

The procedural history of this case is set forth in this court's order of January 25, 1993, and need not be repeated here.

The federal courts have broad power to grant or deny equitable relief. *Holt v. Sarver*, 442 F.2d 304 (8th Cir.1971); *Knowles v. Board of Public Instruction*, 405 F.2d 1206, 1207 (5th Cir.1969); *Johnson v. Lark*, 365 F.Supp. 289, 304 (E.D.Mo.1973). A permanent injunction may be issued under the provisions of Fed.R.Civ.P. 65. However, a "large degree of discretion is vested in the trial court" in determining whether an injunction should issue. *American Home Investment Co. v. Bedel*, 525 F.2d 1022, 1023 (8th Cir.1975), *cited with approval in Rittmiller v. Blex Oil, Inc.*, 624 F.2d 857 (8th Cir.1980). Further, injunctive relief is considered an "extraordinary remedy." *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2942 at 368 (1973). Federal courts should not employ their equitable power to interfere with the internal administration of state agencies absent a clear showing of a violation of federally protected rights. *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982); *Anderson v. Hascall*, 566 F.Supp. 1492, 1495 (D.Minn.1983). Traditionally, "the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy." 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2941 at 368–69. The burden of proving these prerequisites is on the party seeking the relief. *United States v. Dorgan*, 522 F.2d 969, 973 (8th Cir.1975). Thus, to obtain permanent injunctive relief, a party must show first, his rights have been violated; second, there is a threat of future violation; and third, such threat is more than a "mere possibility." *Rogers v. Scurr*, 676 F.2d at 1214. Such a showing has been made in this case on the issues addressed in this order.

In *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir.1981), our court of appeals delineated the relevant factors to be considered by a court in ruling a motion for preliminary injunctive relief.

Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the plaintiff; (2) the state of balance between such harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest.

*Id.*, 640 F.2d at 113. Further, "[t]he dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently-existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982) (quoting *Holiday Inns of America, Inc. v. B. & B. Corp.*, 409 F.2d 614, 618 (3d Cir.1969)). Thus, the inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. And, the burden of proving these prerequisites is on the party seeking injunctive relief. *United States v. Dorgan*, 522 F.2d 969, 973 (8th Cir.1975). These requirements also clearly have been met.

In light of the directives of the appellate courts to enter one final order whenever possible, including attorney fees, so any appeal will not be bifurcated, this court will issue a preliminary injunction at this time, which will become permanent at the time of the decision on attorney fees.

The evidence presented to this court demonstrated a persistent failure by defendants to come into substantial compliance with the federal law and regulations which require (1) that expedited food stamps be provided within five (5) days to eligible households; (2) that food stamp applicants be permitted to apply for food stamps and have applications mailed on the date they first contact county Division of Family Services (DFS) offices; (3) that defendants provide appropriate notice and appeal rights concerning a denial of expedited food stamps. The court finds it unnecessary here to recount all of the evidence in the record concerning each instance of defendants' noncompliance.

This court does not find any bad faith on the part of defendants in coming into compliance with federal law; however, the slow pace of reforms and the fact that some reforms occurred only as a result of this litigation and on the eve of trial suggest that progress will continue at a snail's pace and numerous individuals eligible for expedited food stamps will not get them absent encouragement from this court. The human suffering, emotional trauma and physical injury that will result from an inability to get food by this country's most needy is too obvious to need further space in this decision. Irreparable injury is clearly present, and there are no other adequate remedies at law. Where there is a likelihood of substantial and irreparable harm, and lack of an adequate remedy at law, injunctive relief is clearly appropriate to combat a persistent pattern of conduct which interferes with applicants receiving the benefits to which they are entitled under federal law. *See Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 557 (9th Cir.1990).

Although the court has broad discretion in fashioning a remedy, *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973), the court has no desire to run DFS or tie the hands of DFS in solving the problems that have been disclosed. Therefore, this order will address what is to be achieved in terms of delivery of food stamps and will leave it to defendants to determine the best way to meet those goals. Thus, this order will be the least intrusive order possible, consistent with an effective solution to the problems addressed, *Rizzo v. Goode*, 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976), and no broader than necessary to remedy the violations. *See Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977).

### Definitions

"DFS" refers to the Missouri Division of Family Services.

"Area" refers to one of the seven administrative areas or management units of DFS,

which consists of one or more counties. The seven areas are listed in "Exhibit A."

"DCN" refers to the Departmental Client Number that DFS assigns to each food stamp applicant, and by which food stamp applicants can be identified.

"FNS" refers to the Food and Nutrition Service of the United States Department of Agriculture.

"USDA" refers to the United States Department of Agriculture.

"Provide" means to make available.

**The Right to Apply for Food Stamps**

The court finds defendants out of compliance concerning food stamp applicants' rights to apply for food stamps and to have applications mailed on the day they contact DFS. The court notes that for a short time immediately prior to trial, defendants exhibited evidence of compliance concerning these requirements. However, defendants' conduct over that short time does not constitute compliance or substantial compliance with the Food Stamp Act and its implementing regulations. Defendants were not in substantial compliance with federal law on each of the items mentioned above and thus, will be ordered to come into substantial compliance. The court hereby enjoins defendants to continue to comply with the Food Stamp Act and its implementing regulations concerning these "program access" issues, as indicated below. 7 U.S.C. § 2020(e)(2); 7 C.F.R. §§ 273.2(c), *et seq.* Defendants shall ensure that:

a. No individual is denied the right to apply for food stamps on the day that he or she contacts a county DFS office. 7 C.F.R. § 273.2(c)(1); Preliminary Injunction dated Aug. 23, 1990;

b. No individual is denied the right to file an application for food stamps by mail or to have an application mailed to him or her on the same day that the individual contacts a county office. 7 C.F.R. § 273.2(c)(2); Preliminary Injunction dated Aug. 23, 1990;

c. Persons coming into county offices during business hours and expressing an interest in receiving food stamps are allowed and encouraged to apply for food stamps that day. 7 C.F.R. § 273.-2(c)(1) and (2); *Harley v. Lyng,* 653 F.Supp. 266, 280 (E.D.Pa.1986);

d. The date an application is filed is recorded on the application (such as by date-stamping) the date it is received. 7 C.F.R. § 273.2(c)(1); *Harley,* 653 F.Supp. at 280;

e. County offices shall not refuse food stamp applications submitted to them at any time during office hours. 7 C.F.R. § 273.2(c)(1) and (2); *Harley,* 653 F.Supp. at 280;

f. County offices neither deny persons their right to apply nor deny them their right to be screened for expedited issuance of food stamps. 7 C.F.R. §§ 273.2(a) and (b); 273.2(i)(2); *Harley,* 653 F.Supp. at 281;

g. County offices shall encourage individuals to file an application form the same day the individual contacts the county office and expresses an interest in obtaining food stamps. 7 C.F.R. § 273.-2(c)(2). Discouraging people from applying the same day they make contact with the county office is inconsistent with this regulation.

h. County offices shall not refuse to accept applications that contain at least the applicant's name, address and signature, and shall not require or suggest that a person handing in such an application take it back and have it completed outside of the local office. 7 C.F.R. § 273.-2(c)(1). *Harley,* 653 F.Supp. at 282;

**The Right to Expedited Service**

The court finds defendants substantially out of compliance concerning the identification of eligible households and the delivery of expedited food stamps to eligible households. 7 U.S.C. § 2020(e)(9); 7 C.F.R. §§ 273.2(i), *et seq.* The court hereby enjoins defendants to provide expedited food stamps to all eligible households pursuant to the standards described below.

Defendants shall ensure that:

a. Expedited food stamps are provided to eligible households no later than five (5) calendar days after the date of application. 7 U.S.C. § 2020(e)(9)(A); 7 C.F.R. § 273.2(i)(3)(i);

b. Food stamp coupons shall be provided to households eligible for expedited food stamps within expedited time frames, regardless of whether the food stamps are mailed to the household or provided at the county DFS office. If ATP cards are provided, then the ATP cards must be available to the recipient in time for the households to redeem the ATP cards for food stamp coupons no later than five (5) days following the date the application was filed. 7 C.F.R. § 273.2(i)(3)(i);

c. In determining whether households are eligible for expedited food stamps based on their monthly income and expenses, households shall be given, if entitled, the standard utility allowance (SUA) or actual utility costs, whichever is greater. SUA is authorized if applicants incur heating or cooling expenses separate from their mortgage or rent payment. 7 U.S.C. § 2020(e)(9)(A)(ii); 7 C.F.R. § 273.9(d)(6); *Harley* (order amending consent judgment signed by USDA);

d. Procedures are implemented to identify correctly households eligible for expedited service at the time the household requests assistance. 7 C.F.R. § 273.2(i)(2);

e. DFS postpones all verification of information contained in a signed application when prescreening indicates eligibility for expedited service, where waiting for that additional verification would prevent DFS from issuing food stamps within the prescribed five (5) days time period. The only information that must be verified prior to certification for expedited food stamps is the identity of the applicant. 7 C.F.R. § 273.2(i)(4)(i);

f. Defendants shall ensure that expedited service is provided to all eligible "homeless" individuals. 7 U.S.C. § 2020(e)(9)(B); 7 C.F.R. §§ 273.2(i)(1) and 271.2; 7 C.F.R. § 271.2;

g. DFS *must* advise applicants, in writing, when they are denied expedited service and of their right to a hearing. 7 C.F.R. § 273.2(i)(4)(v), 273.15(d)(1); *Harley*, 653 F.Supp. at 282;

h. An agency conference shall be scheduled for a household contesting a denial of expedited issuance within two (2) working days, unless the household requests that it be scheduled later or states that it does not wish to have an agency conference. 7 C.F.R. § 273.-15(d)(2);

i. The client shall be advised of the agency's decision regarding expedited service eligibility immediately following the agency conference. If the result of an agency conference is a decision favorable to the claimant, then DFS shall expedite the case immediately (e.g., if mail issuance is used, then the food stamps will be issued no later than the next working day following the day of the agency conference decision). 7 C.F.R. § 273.15(d).

This court finds that additional orders concerning posting of signs advising applicants of their rights, and advising employees of their obligations are not necessary in light of the court's finding that DFS will make good faith effort to comply with this order and appropriate laws and regulations.

### Written Notice of Denial of Expedited Issuance Determination

Defendants shall provide to all applicants written notice confirming or denying the household's eligibility for expedited issuance. Said notice shall be in plain language to convey the information required. The notice shall include, at minimum, the following information: (a) the name of the individual who denied expedited service; (b) the date of the denial; (c) the applicant's name and DCN; (d) the reason for denial; (e) the appeal rights (the right to an agency conference and fair hearing); (f) the telephone number of a person to contact regarding an appeal; and (g) the telephone number of the local legal services program. "Exhibit B" attached shall be deemed to satisfy the notice requirement. The parties should note that the exhibit submitted to the court has been modified.

Defendants shall ensure that the telephone number given shall be an effective means of requesting an appeal of an expedited service denial.

### Training and Manual Requirements

Defendants shall include information about the federally mandated expedited service requirements and the contents of this order in their training programs and written training materials.

Defendants shall provide plaintiffs' counsel with copies of any manual revisions and/or memoranda distributed pursuant to this section for the next two years.

### Monitoring

#### Monitoring Compliance with the "Right to Apply"

Defendants shall conduct "blind testing" concerning the right to apply for food stamps, the right to have applications mailed on the day of initial contact, and the right to apply for food stamps by mail. Such testing shall consist of telephone calls and "in-person" visits to county offices to test compliance with these rights. Said "testing" shall be conducted on a semi-annual basis, to be completed November 15 and May 15, with the first test to be completed November 15, 1993. The procedures described in "Exhibit C" are deemed to meet the "testing" requirements of this section.

Defendants shall ensure that the offices "tested" are randomly selected and that appropriate measures are taken to safeguard the fact that the callers are "testers."

Defendants shall compile reports concerning the results of said "testing." These reports will be provided to plaintiffs and the court as indicated below.

If the above-mentioned "testing" shows that any office is out of compliance concerning food stamp applicants' "right to apply for food stamps" as set out in this order, defendants shall correct any such noncompliance by the next semiannual review.

#### Monitoring Compliance with the Right to Expedited Service

On a quarterly basis, commencing November 15, 1993, defendants shall conduct case file reviews to determine defendants' level of compliance in identifying households who are eligible for expedited service and in providing expedited food stamps to eligible households.

Defendants shall ensure that case files are selected in a statistically valid manner. Defendants shall review cases that were not identified as eligible for expedited service at the time of application, in order to produce statistics concerning the issues herein.

Defendants shall also review a small random sample of cases that were identified as "expedited" cases at the time of application and provided expedited service, according to defendants' computer system. Defendants shall review whether these "expedited" cases were, in fact, provided expedited service, as indicated by defendants.

A methodology for selecting food stamp case files and conducting the review of these case files is specified in "Exhibit D." The methodology in Exhibit D shall be deemed to constitute a statistically valid methodology for conducting the case file reviews required by this order.

Defendants shall ensure that the file review monitoring described in this section is conducted by "state level" staff.

#### Expedited Service Compliance Statistics

Defendants shall produce statistics regarding:

a. the percentage of households identified as eligible for expedited service by DFS who were provided food stamps within expedited service time frames;

b. the percentage of households that were properly identified by DFS as meeting expedited food stamp eligibility criteria;

c. the percentage of cases in which households eligible for expedited food stamps were provided food stamps within expedited service time frames.

The methodology and formulae on which these statistics are based is explained in "Exhibit E."

## Statewide Expedited Timeliness Reports

### Reports

Defendants shall continue to produce expedited food stamp "timeliness" reports, which will measure defendants' level of compliance in providing food stamps to households whom they have identified as eligible for expedited service. The methodology for computing such statistics is described in "Exhibit E."

Defendants shall continue to compute these statistics on a county, Area and statewide basis and shall aggregate these statistics by month and by year.

DFS shall continue to produce statistical reports regarding the total number of food stamp applications processed and the number of households found eligible for "expedited service" by defendants. These reports shall be tabulated on a monthly and an annual basis for each county, Area and the entire state.

### Computer Programming

Defendants shall ensure that the statistical reports described above are based on valid and reliable methods of computer programming.

To ensure the validity of the programming used to produce expedited service timeliness reports, defendants shall take the following steps to improve their computer programming methods:

a. Within six (6) months from the date of this order, defendants shall produce "documentation" of the computer system used to produce expedited food stamp timeliness reports. Defendants shall produce documentation that establishes the reliability and validity of their computer programming methods. Defendants' documentation shall include, but not be limited to, validation that food stamp applications are correctly matched with expedited food stamp payments or issuances;

b. Within six (6) months from the date of this order, defendants shall develop a statistically valid "test data" set concerning its computer programming of expedited food stamp timeliness reports.

Defendants shall provide plaintiffs with said documentation and "test data" set for their review. Plaintiffs shall advise defendants as to whether plaintiffs are satisfied with the validity and reliability of defendants' computer programming for producing expedited food stamp timeliness statistics. If the parties cannot reach agreement regarding the validity of defendants' computer programming, the parties may seek the court's intervention to resolve the dispute.

### Noncompliance/Corrective Action

Defendants have advised the court that they are seeking 100 percent compliance with federal expedited service provisions and are making good faith efforts to achieve that goal. *See Alexander v. Hill,* 707 F.2d 780, 784 (4th Cir.), *cert. denied,* 464 U.S. 874, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983); *Withrow v. Concannon,* 942 F.2d 1385, 1387–88 (9th Cir. 1991); *Haskins v. Stanton,* 794 F.2d 1273, 1277 (7th Cir.1986); *Robertson v. Jackson,* 766 F.Supp. 470, 476 (E.D.Va.1991), *aff'd,* 972 F.2d 529 (4th Cir.1992); *Brown v. Luna,* 735 F.Supp. 762, 767 (M.D.Tenn.1990).

Random and unforeseen circumstances involving individual caseworkers or offices may result in less than 100 percent compliance in a given month; however, systematic or programmatic barriers to 100 percent compliance shall be removed when they are identified.

Defendants must comply with the Food Stamp Act "as strictly as is humanly possible" and "eliminate all but the truly inevitable instances of noncompliance." *Withrow,* 942 F.2d at 1388–89; *Haskins,* 794 F.2d at 1277.

Given that a small degree of human error is unavoidable, the court hereby establishes that the following levels of compliance will be deemed substantial compliance with federal mandates to provide expedited food stamps to eligible households, as long as defendants continue good faith substantial efforts to achieve 100 percent compliance.

a. Defendants shall properly identify at least 95 percent of all eligible households who are eligible for expedited food stamps;

b. Defendants shall provide expedited service to at least 95 percent of all households who are identified as eligible for expedited food stamps;

c. Defendants shall provide expedited service within ten (10) days of the date of application to at least 98 percent of all households identified as eligible for expedited service.

d. Defendants shall provide expedited service to at least 93 percent of all households who are eligible for expedited food stamps.

The levels of compliance set forth shall be considered substantial compliance only as long as the court is satisfied that defendants are making reasonable and good faith efforts to reach 100 percent compliance.

If defendants fall below these compliance targets in any Area in any given six-month period, defendants shall bring the Area in statistical compliance by the time of the next semi-annual review.[1] If defendants demonstrate a statewide level of compliance that is less than the above-stated compliance targets, defendants shall bring the state into substantial compliance by the time of the next semi-annual review. If any county falls below the level of substantial compliance required above, defendants shall bring that county into substantial compliance by the next semi-annual review.

### Reporting

Defendants shall produce "monitoring reports" concerning all monitoring that is conducted pursuant to this order, including the "testing" of the right to apply for food stamps, the review of "expedited" cases and the "mail issuance testing." Defendants shall attach all relevant statewide reports to these monitoring reports.

These monitoring reports shall be provided to plaintiffs' attorneys on a quarterly basis, within thirty (30) days of the completion of these monitoring reviews. Defendants shall provide the court with copies of these reports on a semi-annual basis.

### Issuance of Expedited Benefits

Defendants shall take all necessary steps to ensure that food stamps are provided within five (5) calendar days of the date of application. 7 U.S.C. § 2020(e)(9)(A).

If defendants continue to use mail issuance of expedited food stamps, defendants shall test whether their mail issuance system is meeting the expedited service time frames by conducting a random sample of food stamp recipients to determine whether food stamps are provided within expedited service time frames.

Defendants shall conduct these reviews on a semi-annual basis. The monitoring methods discussed in "Exhibit F" shall be deemed to comply with this testing requirement.

Based on said "mail issuance" testing, defendants shall evaluate whether their centralized mail issuance system is meeting the federal expedited service time frames.

If defendants are unable to meet expedited time frames using their current mail issuance system, defendants shall take all necessary steps to develop an issuance system that provides expedited food stamps in accordance with federal law and regulations.

### Miscellaneous

For three (3) years after the signing of this order, defendants shall forward to plaintiffs any monitoring reviews (including quality assurance, management evaluation, quality control reviews, state level operations reviews and FNS reviews) and "corrective action" plans concerning the issues in this case, as well as any correspondence with FNS and all income maintenance memoranda and/or manual revisions concerning the issues in this case. Following this three-year period, defendants shall provide these complaints, re-

---

1. This assumes that St. Louis City, St. Louis County and Jackson County are each independent Areas. If DFS were to redefine its seven (7) Areas so that any of these three counties were no longer an Area, DFS would still be required to determine compliance statistics for these three counties and must bring these counties into compliance if they fall below the compliance targets indicated above.

views and corrective action plans upon request.

Also for the next three (3) years, defendants shall maintain for each Area a file in which complaints about expedited food stamp services are kept and shall make that file available to plaintiffs, upon request.

Defendants shall make food stamp case files and computer tapes available to plaintiffs' counsel upon thirty (30) days notice. Plaintiffs' counsel shall conduct file reviews, statistical analysis and other appropriate monitoring when necessary to monitor defendants' compliance with the court's order.

The court shall retain jurisdiction to monitor compliance with this order so that any of the parties to this order may apply to this court at any time for such orders and directions as may be necessary and appropriate for the enforcement of this order.

Either party shall retain the right to file a motion to modify this decree when it is no longer equitable that the decree have prospective application or when there is a significant change in law or factual circumstances. The court intends that this order will be modified to the extent necessary to conform to changes in federal law.

IT IS, THEREFORE, ORDERED that a preliminary injunction is granted under the terms set forth in the discussion above. It is further

ORDERED that this order granting the preliminary injunction shall take effect immediately and the parties shall immediately prepare to implement the testing required so that the first tests can be completed by November 15, 1993. It is further

ORDERED that within thirty (30) days hereof, plaintiffs shall file their motion, memorandum and affidavits in support of their motion for attorney fees and costs and defendants are granted forty-five (45) days in which to file their memorandum in opposition to plaintiffs' motion for fees and costs. It is further

ORDERED that this preliminary injunction will be made permanent on the date this court issues an order resolving attorney fees.

Dated this 27th day of July, 1993.

/s/ William A. Knox

William A. Knox

United States Magistrate Judge

EXHIBIT A
ADMINISTRATIVE AREAS

AREA 1

Andrew County (2)
Atchison County (3)
Buchanan County (11)
Caldwell County (13)
Carroll County (17)
Cass County (19)
Chariton County (21)
Clay County (24)
Clinton County (25)
Cooper County (27)
Daviess County (31)
DeKalb County (32)
Gentry County (38)
Grundy County (40)
Harrison County (41)
Holt County (44)
Howard County (45)
Johnson County (51)
Lafayette County (54)
Linn County (58)
Livingston County (59)
Mercer County (65)
Nodaway County (74)
Pettis County (80)
Platte County (83)
Putnam County (86)
Randolph County (88)
Ray County (89)
Saline County (97)
Sullivan County (105)
Worth County (113)

AREA 2

Adair County (1)
Audrain County (4)
Boone County (10)
Callaway County (14)
Clark County (23)
Cole County (26)
Franklin County (36)
Gasconade County (37)
Jefferson County (50)
Knox County (52)
Lewis County (56)
Lincoln County (57)
Macon County (61)
Marion County (64)
Monroe County (69)
Montgomery County (70)

AREA 2
Osage County (76)
Pike County (82)
Ralls County (87)
St. Charles County (92)
Schuyler County (98)
Scotland County (99)
Shelby County (102)
Warren County (109)

AREA 3
Bollinger County (9)
Butler County (12)
Cape Girardeau County (16)
Carter County (18)
Crawford County (28)
Dent County (33)
Dunklin County (35)
Howell County (46)
Iron County (47)
Madison County (62)
Mississippi County (67)
New Madrid County (72)
Oregon County (75)
Pemiscot County (78)
Perry County (79)
Reynolds County (90)
Ripley County (91)
St. Francois County (94)
Ste. Genevieve County (95)
Scott County (100)
Shannon County (101)
Stoddard County (103)
Washington County (110)
Wayne County (111)

AREA 4
Barry County (5)
Barton County (6)
Bates County (7)

AREA 4
Benton County (8)
Camden County (15)
Cedar County (20)
Christian County (22)
Dade County (29)
Dallas County (30)
Douglas County (34)
Greene County (39)
Henry County (42)
Hickory County (43)
Jasper County (49)
Laclede County (53)
Lawrence County (55)
McDonald County (60)
Maries County (63)
Miller County (66)
Moniteau County (68)
Morgan County (71)
Newton County (73)
Ozark County (77)
Phelps County (81)
Polk County (84)
Pulaski County (85)
St. Clair County (93)
Stone County (104)
Taney County (106)
Texas County (107)
Vernon County (108)
Webster County (112)
Wright County (114)

AREA 5
Jackson County (48)
AREA 6
St. Louis City (115)
AREA 7
St. Louis County (96)

EXHIBIT A

# Missouri Department of Social Services
# Division of Family Services
## Area Offices

● Area Offices

## EXHIBIT B

DIVISION OF FAMILY SERVICES
EXPEDITED SERVICE NOTICE

| | DATE OF APPLICATION |
|---|---|
| CASE NA | DCN | WORKER NAME/LOAD |

### CAN YOU GET EXPEDITED (EMERGENCY) FOOD STAMPS?

If you meet one of the following criteria you qualify for expedited Food Stamps.

1. TEMPORARILY LIVING WITH ANOTHER, IN A SHELTER, OR HOMELESS.

2. GROSS MONTHLY INCOME IS LESS THAN $150 AND YOUR RESOURCES ARE LESS THAN $100.

3. RENT/MORTGAGE AND UTILITIES ARE MORE THAN YOUR HOUSEHOLD GROSS INCOME AND RESOURCES.

4. YOU ARE A DESTITUTE MIGRANT OR SEASONAL FARMWORKER WHOSE CASH/SAVINGS ARE $100 OR LESS.

To receive expedited coupons, you must complete the Food Stamp application, be interviewed, and verify your identity You may apply by mail and the interview can, under some circumstances, be conducted by telephone.

### DECISION ABOUT EXPEDITED (EMERGENCY) FOOD STAMPS

☐ YOU QUALIFY FOR EXPEDITED (EMERGENCY) FOOD STAMPS
☐ YOU SHOULD RECEIVE THE COUPONS WITHIN 5 DAYS
OR
☐ THE COUPONS ARE MAILED THE FIRST WORKING DAY OF _____

☐ YOU DO NOT QUALIFY FOR EXPEDITED FOOD STAMPS, BUT YOU MAY STILL QUALIFY FOR FOOD STAMPS. WE WILL NOTIFY YOU ON YOUR ELIGIBILITY FOR FOOD STAMPS.

REASON YOU ARE NOT ELIGIBLE _____

CALL YOUR WORKER IF YOU DO NOT RECEIVE YOUR COUPONS ▶

### WHEN YOU DISAGREE WITH OUR DECISION ON YOUR EXPEDITED (EMERGENCY) FOOD STAMPS

• YOU HAVE A RIGHT TO A CONFERENCE WITH A SUPERVISOR TO BE HELD WITHIN 2 (TWO) WORKING DAYS.

DO YOU WANT TO SCHEDULE A CONFERENCE WHILE YOU ARE IN THE OFFICE?   ☐ YES   ☐ NO

YOU CAN SCHEDULE A CONFERENCE ON THE DENIAL OF YOUR EXPEDITED FOOD STAMPS BY ASKING YOUR CASEWORKER, OR ASK TO TALK WITH: _____

### OR

• YOU MAY REQUEST A FAIR HEARING IF YOU ARE DENIED EXPEDITED FOOD STAMP OR ON ANY OTHER AGENCY

ACTION WHICH AFFECTS YOUR PARTICIPATION IN THE FOOD STAMP PROGRAM.

### YOU CAN GET FREE LEGAL ADVICE AT

*EXHIBIT C*

## METHODOLOGY FOR CONDUCTING "BLIND TESTING" REQUIRED BY REMEDIAL ORDER

1. Testing which consists of "in-person" visits and telephone calls to county DFS offices as described below shall be deemed to comply with the requirements of this order.

2. Neither the "in-person" visits nor telephone calls will be announced. The "testers" shall not identify themselves as state employees but will instead act as food stamp applicants and/or potential food stamp applicants.

3. For both the "in-person" and "telephone" testing described below, defendants shall take all necessary measures to safeguard the fact that the persons contacting DFS offices are "testers."

4. For both the "in-person" and "telephone" testing described below, defendants shall ensure that no county or Area office staff are informed of the names of the county offices selected or when these "tests" shall take place.

5. Defendants shall ensure that no DFS staff are used in the "blind testing." Defendants may satisfy the "testing" requirement by using staff from other Divisions of Legal Services' Investigation Section, or by hiring individuals who are not regularly employed by defendants (e.g. law students or undergraduate students) to conduct said testing.

6. The results of both the "in-person" and "telephone" "testing" shall be tabulated in reports and provided to plaintiffs and the Court as specified in the Order.

7. Defendants shall compile statistics regarding the number and percentage of counties whose responses to this testing violate the Court's injunction regarding the right to apply for food stamps.

8. Defendants shall also provide the names of any counties whose responses indicate violations of the Court's injunction concerning the right to apply for food stamps.

9. The names of the counties that are out of compliance and the statistics in paragraph 7 shall be included in the reports that are produced pursuant to the Remedial Order.

## A. *In-Person Testing*

10. In each six (6) month period, defendants' shall send in-person "testers to DFS county offices to attempt to apply for food stamps in person.

11. An "attempt to apply" shall constitute an "in-person" visit to the county DFS office by the "tester" in which the "tester" determines whether he/she will be allowed to apply on the date that he/she has contacted that office. The "tester" need not complete a food stamp application in every case but the tester may not cease the "testing" until the tester is certain that he/she will be permitted to apply on the date that he has contacted the county DFS office.

12. Defendants shall send "testers" to a minimum of fifteen (15) county DFS offices in each six month period. The offices selected for review shall be selected randomly, except that defendants shall ensure that the St. Louis City, St. Louis County and Kansas City offices are each reviewed at least once in each six month period.

13. In addition, any county that is contacted by defendants which is found to violate any aspect of the right to apply for food stamps shall be contacted in the next semi-annual review period.

14. Each "tester" shall attempt to apply for food stamps and shall record the result of his/her attempt to apply for food stamps, including any instances in which the testers were denied the right to apply and/or discouraged from applying for food stamps on the date of initial contact.

15. The term "discourage" in this "in-person" testing refers to any and all attempts by county office staff (whether overt or by inference) to dissuade the "tester" applicant from applying on the date that he/she visits the DFS office.

16. Defendants shall compile statistics concerning the number and percentage of counties visited that denied the right to apply and/or discouraged "testers" from applying for food stamps on the date that they contacted the county DFS office. *See* Paragraph 7 above.

### B. *Telephone Testing*

17. Defendants shall contact by telephone, every DFS county office at least once in each six (6) month period to determine whether county offices are complying with the right to have applications mailed on the date of initial contact and the right to apply for mail.

18. Telephone testers contacting Jackson County, St. Louis City and St. Louis County offices shall request that food stamp applications be mailed to real addresses in those areas.

19. "Testers" shall also inquire as to whether they can complete the entire application process by mail or whether they must come into the office for a "face-to-face" interview.

20. Defendants shall record whether the county office agreed to mail out a food stamp application.

21. For at least twenty (20) counties contacted in each six-month period, defendants shall determine whether the application was mailed on the date that the "tester" contacted the county office, in accordance with federal regulations.

22. Defendants shall make this determination by tracking whether the food stamp application was in fact reviewed at the appropriate address and reviewing the post mark on the envelope containing the application and if necessary, the date on any "telephone logs" maintained by the county office, or any other reliable method.

23. Defendants shall also record any other information regarding whether the county offices contacted denied or discouraged the applicant from applying by mail or receiving an application in the mail.

24. Defendants shall compile statistics regarding the number and percentage of counties who failed to mail applications on the date of initial contact, denied the right to receive an application in the mail altogether, and/or discouraged the "tester" from applying by mail. *See* Paragraph 7 above.

25. The term "discouraged" in this "telephone" testing refers to any and all attempts by the county office staff to dissuade the "tester" applicant from receiving an application in the mail or applying for food stamps by mail. This definition includes but is not limited to any communications to the tester that he/she:

(a) should not mail in an application because he/she will have to come in to the DFS office in-person for an interview;

(b) is required to have a "face-to-face" interview without mentioning that there are exceptions to the "face-to-face" interview requirement or that expedited food stamps may be received without a "face-to-face" interview;

(c) should not mail in an application because it will take longer to receive food stamps;

(d) would be better off if he/she came in to the office to apply in-person;

(e) probably is not eligible for food stamps.

### . *EXHIBIT D*

### *EXPEDITED FOOD STAMP CASE FILE REVIEWS*

I. *File Reviews of Cases Not Identified By Defendants as Eligible for Expedited Food Stamps.*

1. Defendants shall conduct quarterly food stamp case file reviews in order to determine their level of compliance in:

(a) identifying households which are eligible for expedited food stamps; and

(b) providing expedited food stamps to households which are eligible for expedited service.

2. In each quarterly case file review, defendants shall review the case files of at least four hundred (400) food stamp applicants who have been approved for food stamps but were not identified as eligible for expedited food stamps in the defendants' computer system.

3. In conducting these file reviews, defendants shall determine whether each food stamp household whose application is reviewed was eligible for expedited food stamps at the time of the application for food stamps and/or any time between the date of

application and the date of the household's approval for food stamps following the date of the application being reviewed (based on a reported change in circumstances or a change in circumstances of which DFS became aware during the application process). For each household which met the criteria for expedited food stamps, defendants shall determine whether food stamps were provided within expedited service time frames. Defendants shall determine their statistical level of compliance with federal law and regulations concerning expedited food stamps based on these file reviews, using the methodologies discussed in Exhibit E.

4. The applications to be reviewed in each quarterly file review shall be selected by a statistically valid random sampling methodology.

5. The random sample shall be stratified by Area and by county to ensure that the sample reflects the true proportion of cases in each Area and each county that exists in the food stamp population of the state. For instance, if 20% of the statewide population of food stamp applications that were not identified as eligible for expedited benefits were from St. Louis City, then 20% of the random sample of applications should be from St. Louis City.

 a. However, if an individual county's percentage of the statewide population of applications that were not identified as eligible for expedited food stamps is less than .5%, then defendants are not required to read case files from that county. Nevertheless, defendants are still required to read the appropriate number of case files (as determined by the stratification of the random sample) from the Area in which the county is located.

6. Each of the case files reviewed in the quarterly file reviews must be reviewed by DFS state level or central office staff. Copy files may be reviewed.

II. *File Reviews of Cases Identified by Defendants as Eligible for Expedited Food Stamps*

1. In each quarterly file review, defendants shall also review the case files of at least fifty (50) food stamp applicants who

have been: (a) approved for food stamps; (b) identified by defendants as *eligible* for expedited food stamps in defendants' computer system; and (c) timely provided expedited food stamps, according to defendants computer system and timeliness reports.

2. Defendants shall determine whether food stamps in these "expedited" cases were actually mailed in time to meet expedited time frames. The purpose of this review is to ensure the integrity of defendants' computer-generated statistics. In other words, defendants shall determine whether the computer system reflects what *actually happened* with the case. This is determined by a review of the case file and the defendants' food stamp mail issuance logs, which contain the actual mailing date of food stamp issuances.

3. In conducting these reviews, defendants shall review each case file to determine if the date of application for food stamps as set out on the actual application form is the same as the application date which was entered into defendants' computer system. Defendants shall also determine whether food stamps were actually mailed on the date indicated in the defendants' computer system by reviewing the date of mailing contained in the mail logs maintained by defendants.

4. The applications to be reviewed in each quarter shall be selected by a statistically valid random sampling methodology.

5. Defendants shall include the results of these reviews in the quarterly reports to be produced pursuant to this Court's Order.

*EXHIBIT E*

*STATISTICS REGARDING EXPEDITED FOOD STAMP COMPLIANCE*

**I.** *The Three (3) Statistics to be Produced Pursuant to the Remedial Order*

1. Using the information obtained from the case file reviews discussed in Exhibit D and the information contained in defendants' computer system, defendants shall determine the following statistics:

a. The percentage of households identified by DFS as eligible for expedited food stamps who were provided food stamps within expedited time frames.

b. The percentage of expedited-eligible households who were properly identified by DFS as eligible for expedited food stamps.

c. The percentage of expedited-eligible households who were provided food stamps within expedited service time frames.

2. The three (3) above-cited statistics to be produced pursuant to this Court's Remedial Order shall be determined by the methodologies set out in this Exhibit.

## II. *The First Statistic (set out in I.1.a above)*

1. The statistic set out in I.1.a, above, shall be obtained from information contained in defendants' computer system regarding the timeliness of the provision of food stamps to households who have been identified by DFS as eligible for expedited food stamps.

2. Defendants shall continue to calculate this timeliness statistic for the state as a whole as well as by county, by Area, and by case type (i.e. initial applications and reapplications) on a monthly and annual basis.

## III. *The Second Statistic (set out in I.1.b above)*

1. The statistic set out in I.1.b, above, is determined by dividing the total number of households that were identified by DFS as eligible for expedited food stamps by the total number of households that were eligible

for expedited food stamps. The fraction would therefore be as follows:

$$\frac{\textit{total \# identified by DFS as expedited-eligible}}{\textbf{total \# expedited-eligible households}}$$

2. The numerator of the above fraction (i.e. total # identified by DFS as expedited-eligible) is obtained from the defendants' computer system for each quarter. The computer contains the number of cases identified as expedited-eligible by DFS.

3. The denominator of the above fraction (i.e. total # expedited-eligible households) is obtained by adding the number in the numerator (i.e. total identified as expedited-eligible) to the number of expedited-eligible cases that DFS failed to identify as expedited-eligible. The number of expedited-eligible cases which DFS failed to identify is arrived at by projecting the results of the quarterly sampling of case file reviews to the population as a whole for that quarter.[1] The fraction as set out in paragraph 1 above can be restated as follows:

$$\frac{\textit{total \# identified by DFS as expedited-eligible}}{\textbf{numerator + total \# exp-elig DFS failed to identify}}$$

4. Defendants shall calculate this statistic by Area and statewide for each quarter.[2]

## IV. *The Third Statistic (as set out in I.1.c above)*

1. The statistic set out in I.1.c, above, is determined by dividing the total number of households that were provided food stamps within expedited time frames by the total

---

1. The term "projected" refers to the method by which the results of a random sampling of case files is applied to the population as a whole. For example, assume a quarterly random sample is selected from a total population of 1,000 cases which had not been identified as expedited-eligible, according to defendants' computer system. If 20% of the randomly selected files reviewed in the case file reviews are determined to have been eligible for expedited food stamps, then that percentage is projected to the population as a whole, resulting in a "projected" number of 200 cases which defendants failed to identify as expedited-eligible for that quarter.

2. If, in the future, the composition of DFS' seven (7) current Administrative Areas is altered to the extent that St. Louis City, St. Louis County and/or Jackson County is no longer a separate Area, defendants shall nevertheless continue to compute expedited service compliance statistics for each of these three (3) geographical units. This condition shall apply to all statistics that are produced pursuant to the Remedial Order, and described in § I.1.a–c of this Exhibit.

number of households that were eligible for expedited food stamps. The fraction would be as follows:

### total # provided expedited food stamps

### total number eligible for expedited food stamps

2. The numerator of this fraction (i.e. the total number provided expedited food stamps) is obtained by adding the total number of households that were timely provided expedited food stamps according to defendants' computer system to the total number that, although not identified by defendants as expedited-eligible, were provided food stamps within expedited time frames (which is a projected number based upon the results of the case file sampling).

3. The denominator of this statistic (i.e. the total number eligible for expedited food stamps) is the same as the denominator in the second statistic. To repeat, it is obtained by adding the total number of households that were identified as eligible for expedited food stamps in defendants' computer system for each quarter to the total number of expedited-eligible households which defendants failed to identify (which is a projected number based upon the results of the quarterly case file sampling).

4. Defendants shall calculate this statistic by Area and statewide for each quarter.[3]

### V. Determining Expedited Food Stamp Timeliness

1. The following requirements for determining expedited service "compliance" apply to the statistics required by the Court Order and § I.1.a–c above.

#### a. Assumed Mailing Times

In determining whether food stamps were provided within expedited service time frames for this statistic, defendants may compare the "date of application" with the "date of mailing" (rather than the "date of receipt"), as long as defendants allot at least two (2) days for mailing.[4] Sundays and federal holidays are not to be counted as part of the two (2) days allotted for mail time in producing documents' expedited "timeliness" statistics.

#### b. Weekends and Holidays

Defendants shall allow no exceptions for weekends and holidays in determining statistics regarding compliance with federal expedited service requirements. Thus, defendants' expedited service statistics shall fully account for the existence of weekends and holidays. For example, if the fifth day following the date of application is a federal holiday or a Sunday (a day on which no mail is delivered), food stamps must be mailed in time to be received prior to the fifth day. In such cases, if food stamps are not received prior to the fifth day, then such cases will be counted as untimely in the above-mentioned statistics.

### EXHIBIT F

### METHODOLOGY FOR MAIL ISSUANCE "TESTING"

1. Pursuant to the Remedial Order, defendants shall "test" whether their mail issuance system is meeting expedited food stamp time frames. The manner described

---

3. As indicated in footnote 2 supra, if defendants ever alter the composition of their seven (7) Areas, so that St. Louis City, St. Louis County and/or Jackson County is no longer separate Areas, they shall continue to compile these statistics separately for each of these three (3) geographical units.

4. In computing the expedited food stamp timeliness statistics required by this Order, defendants may use a "date of discovery" different from the "application date" in the following circumstances: (1) a change in circumstances caused the applicant to become eligible for expedited service after the date of application; and (2) following the date of application, DFS received new information indicating that the applicant was eligible for expedited service at the time of application; and (3) when otherwise allowed by federal regulations. DFS may not use a "discovery date" different from the "application date" in any case in which it misidentified an expedited-eligible food stamp applicant as "ineligible" for expedited service but subsequently discovered the mistake on a later date than the "application date."

below shall be deemed to comply with this order.

2. Defendants shall randomly select three hundred (300) food stamp applicants to be contacted in each six (6) month or semi-annual review period using the below-mentioned methodology.

3. Prior to the beginning of each six (6) month review period, defendants shall randomly select the days for which the food stamp applicants shall be contacted during the six (6) month review period. In randomly selecting days, the defendants shall ensure that they select enough days so that a sufficient number of "back-up" days are available, in case the defendants cannot reach the required numbers of applicants on the days selected.[1]

4. The food stamp applicants selected shall be applicants who have been found eligible for expedited food stamps by DFS.

5. Defendants shall contact applicants from the list of applicants who have been found eligible for expedited food stamps on the days that have been randomly selected.

6. The random sample of food stamp applicants selected shall be stratified by Area, so that the number of applicants chosen within each Area is proportionate to the percentage of food stamp applicants that have been found eligible for expedited service in that Area as a whole. For example, if 25% of the expedited-eligible food stamp applicants typically live in Area 3, then 25% of the three hundred (300) applicants contacted must be persons who applied in Area 3.

7. Defendants shall ensure that they contact enough food stamp applicants to reach the stratified number for each Area.

8. Defendants shall contact these applicants on the second day following the date that food stamps were mailed from DFS' state office, and every day thereafter until at least the tenth (10th) day following the mailing of the "expedited" food stamps, or until these applicants report that they have received their "expedited" food stamps, whichever date is earlier.

9. If defendants do not receive a satisfactory response (i.e. a response that enables them to determine when food stamps were received), they shall select the next name on the list (on the randomly selected day), and shall continue to contact applicants until they receive discernable responses from the required number of food stamp applicants from each Area.

10. While defendants shall randomly select the days on which telephone calls should take place at the outset, they shall ensure that the dates of the calls are not announced until the testing is to take place. Furthermore, defendants shall not advise any county office staff as to the dates of said testing, before the dates that said testing is scheduled to take place.

11. Defendants shall compile reports containing aggregate data regarding the number of days that it takes for "expedited food stamps" to be received by eligible households following the date of application. Defendants shall produce statistics concerning the percentage of cases in which food stamp were received on each day following the date of application (as indicated in Attachment 1) and the percentage of cases in which it takes longer than the defendants' two day assumed mailing time (which defendants use in computing their expedited food stamp timeliness statistics).[2]

1. Defendants may limit the random sample of days for "mail issuance" testing to three (3) months out of a six (6) month review period, rather than test throughout the six (6) month period. However, defendants shall vary the three (3) month period chosen for review in each year that they conduct such testing. For example, if defendants conducted mail issuance testing in the months of October–December, 1993 (assuming the review period is July–December

1993), they would review the other quarter of that review period (July–September) in the next year that they conduct such testing.

2. Attachment 1 is a compilation of the results of "mail issuance" testing that was conducted by defendants prior to the adoption of the Court's final Remedial Order.

Attachment 1
Telephone Survey of Actual Mail Receipt—Testing from Date of Application

| 2/11/93—3/30/93 (16 days tested) * | | | | 2/1 7/93—3/30/93 (15 days tested) | | | |
| Number of days | total | daily % | accum. % | Number of days | total | daily % | accum. % |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 0 | 0 | 0.00% | 0.00% | 0 | 0 | 0.00% | 0.00% |
| 1 | 0 | 0.00% | 0.00% | 1 | 0 | 0.00% | 0.00% |
| 2 | 306 | 23.50% | 23.50% | 2 | 278 | 23.82% | 23.82% |
| 3 | 455 | 34.95% | 58.45% | 3 | 397 | 34.02% | 57.84% |
| 4 | 309 | 23.73% | 82.18% | 4 | 300 | 25.71% | 83.55% |
| 5 | 149 | 11.44% | 93.63% | 5 | 146 | 12.51% | 96.06% |
| 6 | 36 | 2.76% | 96.39% | 6 | 17 | 1.46% | 97.51% |
| 7 | 16 | 1.23% | 97.62% | 7 | 7 | 0.60% | 98.11% |
| 8 | 8 | 0.61% | 98.23% | 8 | 7 | 0.60% | 98.71% |
| 9 | 4 | 0.31% | 98.54% | 9 | 3 | 0.26% | 98.97% |
| 10 | 2 | 0.15% | 98.69% | 10 | 1 | 0.09% | 99.06% |
| 11 | 0 | 0.00% | 98.69% | 11 | 0 | 0.00% | 99.06% |
| 12 | 4 | 0.31% | 99.00% | 12 | 1 | 0.09% | 99.14% |
| 13 | 2 | 0.15% | 99.16% | 13 | 1 | 0.09% | 99.23% |
| 14 | 1 | 0.08% | 99.23% | 14 | 1 | 0.09% | 99.31% |
| 15 | 1 | 0.08% | 99.31% | 15 | 0 | 0.00% | 99.31% |
| 16 | 1 | 0.08% | 99.39% | 16 | 0 | 0.00% | 99.31% |
| 17 | 1 | 0.08% | 99.46% | 17 | 1 | 0.09% | 99.40% |
| 18 | 1 | 0.08% | 99.54% | 18 | 1 | 0.09% | 99.49% |
| 19 | 1 | 0.08% | 99.62% | 19 | 1 | 0.09% | 99.57% |
| 20 | 0 | 0.00% | 99.62% | 20 | 0 | 0.00% | 99.57% |
| 21 | 1 | 0.08% | 99.69% | 21 | 1 | 0.09% | 99.66% |
| 22 | 0 | 0.00% | 99.69% | 22 | 0 | 0.00% | 99.66% |
| 23 | 0 | 0.00% | 99.69% | 23 | 0 | 0.00% | 99.66% |
| 24 | 0 | 0.00% | 99.69% | 24 | 0 | 0.00% | 99.66% |
| 25 | 0 | 0.00% | 99.69% | 25 | 0 | 0.00% | 99.66% |
| 26 | 1 | 0.08% | 99.77% | 26 | 1 | 0.09% | 99.74% |
| 27 | 1 | 0.08% | 99.85% | 27 | 1 | 0.09% | 99.83% |
| 28 | 0 | 0.00% | 99.85% | 28 | 0 | 0.00% | 99.83% |
| 29 | 0 | 0.00% | 99.85% | 29 | 0 | 0.00% | 99.83% |
| 30 + | 2 | 0.15% | 100.00% | 30 + | 2 | 0.17% | 100.00% |

* includes 4 day holiday weekend